415 F.2d 901
 134 U.S.App.D.C. 321
 Thomas E. PAYNE, Individually and Representing the
Metropolitan Citizens Advisory Council, et al., Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit Company, Inc., Intervenor.
D.C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
Thomas E. PAYNE et al., Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit System, Inc., Intervenor.
 Nos. 20714, 20744, 21029, 20988.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 8, 1968.
Decided Oct. 8, 1968.
 
 Mr. Landon Gerald Dowdey, Washington, D.C., with whom Mr. David S. Levy, Washington, D.C., was on the brief, for petitioners in Nos. 20,714 and 20,988.
 Mr. Harvey M. Spear, New York City, with whom Mr. Edmund L. Jones, Washington, D.C., was on the brief, for petitioner in Nos. 20,744 and 21,029 and intervenor in Nos. 20,714 and 20,988. Messrs. Leon Spoliansky, New York City, and Samuel Langerman, Washington, D.C., also entered appearances for intervenor in No. 20,714.
 Mr. Russell W. Cunningham, General Counsel, Washington Metropolitan Area Transit Commission, for respondent.
 Before WRIGHT, MCGOWAN and ROBINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 On October 17, 1966, D.C. Transit System, Inc. filed new tariffs with the Washington Metropolitan Area Transit Commission proposing various increases in its fares.[1] After ordering public hearings on Transit's application,[2] the Commission on November 15, 1966, suspended the schedule of proposed fares, pending completion of its investigation and hearings, until February 13, 1967.[3]
 
 
 2
 Public hearings were held between November 10 and December 7, 1966. The testimony and exhibits introduced before the Commission relating to projected operating results under the proposed fares were based on the calendar year 1967 as the future annual period, and the 12-month period ending August 31, 1966, was used as the historical test year.
 
 
 3
 On January 12, 1967, the Commission issued Order No. 656[4] (the 'Interim Order') which directed that further hearings be held for the purpose of taking additional testimony on the question of margin of return, and ordered certain increases in Transit's fares on an interim basis pending completion of the additional hearings. In its Interim Order the Commission found that under existing fares Transit would sustain a net operating loss of $726,033 for the calendar year 1967, and consequently that those fares were unjust and unreasonable. However, on the basis of the record then before it the Commission was unable to make the inquiries and findings on the issue of fair return required by our decision in D.C. Transit System, Inc. v. WMATC, 121 U.S.App.D.C. 375, 350 F.2d 753 (1965), cert. denied 389 U.S. 847, 88 S.Ct. 52, 19 L.Ed.2d 115 (1967), and could not determine whether the return which would result from Transit's proposed fares would be fair and reasonable. For these reasons, it granted a temporary fare increase designed to 'enable Transit to cover its operating expenses and bare capital costs,'[5] while reopening the record for the taking of additional testimony. The Interim Order suspended Transit's proposed tariffs for a further period, until March 15, 1967, and provided that the temporary fares therein prescribed were to be effective only until 'March 15, 1967, unless otherwise prescribed by the final order of this proceeding.'[6]
 
 
 4
 A motion for reconsideration, filed by Thomas Payne, the Metropolitan Citizens Advisory Council, and a number of individual residents of the District of Columbia, was denied by the Commission on January 23, 1967.[7] These movants are the petitioners in No. 20,714. They contend that the Interim Order was beyond the statutory authority of the Commission and was not supported by necessary findings. At their request, this court on January 27, 1967, stayed the Interim Order insofar as it granted an increase in Transit's fares, and ordered the fares in effect prior to the Interim Order to be reinstated as of January 28, 1967.
 
 
 5
 On February 1, 1967, the Commission issued Order No. 667 which reinstated the procedural provisions of the Interim Order, reopening the hearings and suspending Transit's proposed tariffs until March 15, 1967. Transit's application for reconsideration of Order No. 667 was denied by the Commission in Order No. 668. Transit has petitioned for review of these two orders in No. 20,744, contending that the Commission violated Transit's rights under its Franchise by suspending its proposed tariffs for a period greater than 120 days from the date of filing.
 
 
 6
 Reopened hearings were held on February 13, 14 and 15, 1967, during which the Commission heard testimony on the subject of rate of return from Dr. Merrill J. Roberts, an independent expert called by the Commission staff, and rebuttal testimony from Mr. V. A. McElfresh, Transit's expert witness, who had testified in the initial hearings. Transit also attempted to introduce evidence showing that because of losses during the first two months of 1967, a fare increase would not provide it with net income for that year in the amount recommended by the staff expert, but the Commission refused to admit this evidence, as not being within the scope of the reopened hearings. On February 23, 1967, following the close of the additional hearings, petitioners Payne and Metropolitan Citizens Advisory Council filed a motion requesting that the record be reopened for the purpose of taking additional evidence 'to determine a fare structure which is equitable and nondiscriminatory.'
 
 
 7
 On March 13, 1967, the Commission issued Order No. 684[8] (the 'Final Order'), denying Transit's proposed tariffs, and establishing a new schedule of fares embodying increases smaller than the company had requested but somewhat greater than the temporary increases granted by the Interim Order.[9] The Commission in its Final Order reaffirmed the findings of the Interim Order that under existing fares Transit would sustain a net operating loss, and that those fares were therefore unjust and unreasonable. It also found that the fares proposed by Transit would yield net operating income of $2,885,271, which it concluded would be in excess of a fair return. Finally, the Commission denied petitioners' motion to reopen the record, and authorized fares which it found would produce net operating income of approximately $1,900,000, representing a return on gross operating revenues of 5.24%. It found that this margin of return would cover estimated debt expense of $1,311,000, and provide a return to the equity holder of $589,000, or 14.08%.
 
 
 8
 Two motions for reconsideration of Order No. 684 were denied by the Commission, one filed by Transit,[10] the other by Thomas Payne and other members of the public.[11] Transit's petition for review of Order 684 is before us in No. 21,029. It claims that the Commission's projection of operating results under the prescribed fares is erroneous because it fails to take into account operating losses sustained during the first two months of 1967, and also that the Commission erred in finding that a rate of return on operating revenues of 5.24% Would be fair and reasonable.[12] In No. 20,988, Thomas Payne and the other movants for reconsideration have petitioned for review of the Commission's Final Order. They contend that the Commission failed to make adequate inquiries and findings on the question of fair return, and that its refusal to make comparative analyses of costs and earnings by route precluded it from establishing a proper and nondiscriminatory fare structure.
 
 I. The Interim Order
 
 9
 In Order No. 656 the Commission found, as we have said, that without a fare increase, Transit would suffer a net operating loss of $726,033 for the year 1967. It noted that there was 'little or no dispute'[13] as to this projection of operating results, and its finding has not been challenged here. The Commission further found that the company's embedded cost of debt for the future annual period would 'exceed a million dollars,' and concluded:
 
 
 10
 'To require the company to operate at such a substantial loss for even a relatively short period of time would be unwise, and indeed could imperil its financial health. Concomitantly, the standard of service rendered by a company in such a condition usually deteriorates drastically; thus, the company and the public would be disadvantaged and possibly suffer irreparable harm.'[14]
 
 
 11
 But though the Commission found that existing fares were 'unjust and unreasonable in that (they) * * * will produce an operating deficit in 1967 that will imperil the Company financially,'[15] it was unable to determine, because of the inadequacy of the record then before it on the question of rate of return, whether the fares proposed by Transit would be just and reasonable. In particular, it felt there was insufficient evidence in the record to permit 'the exercise of judgment, or the reaching of conclusions,'[16] with respect to such matters as the risks to which the company is subject, for purposes of comparing its earnings with those of other companies, and its cost of capital. It thus concluded that there was compelling need for supplementation of the record, before it could confidently fulfill its responsibility to prescribe the 'lawful fare * * * to be in effect.'[17] And it decided to take the course of reopening the record and instructing its staff to 'engage the services of an expert having expertise in, and knowledge of, the subject matter.'[18]
 
 
 12
 Faced with these circumstances, the Commission sought some means by which it could alleviate Transit's financial crisis without sacrificing the public's right to pay no more than just and reasonable fares. Laying aside the solution which it ultimately devised, the choices before the Commission were either to permit Transit's proposed tariffs to go into effect pending completion of the additional hearings and issuance of a final order, with the substantial probability that the public would thus be charged unreasonably high fares during that period, or suspending the proposed tariffs in toto for an additional length of time, thereby jeopardizing Transit's financial stability and its continued ability to render service to the public. Petitioners in No. 20,714 claim, in effect, that no lawful means existed by which the Commission could escape this dilemma-- and that, even assuming statutory authority for what was done, the Commission's action constitutes an abuse of discretion. We disagree.
 
 
 13
 We think there can be little doubt of the Commission's general authority to issue interim orders 'although the evidence introduced does not enable the tribunal to dispose of the issues completely or permanently * * *.'[19] It is true that the Commission did not make a finding, as required by Section 6(a)(2) of the Washington Metropolitan Area Transit Regulation Compact,[20] that the proposed rates filed by the carrier were 'unjust, unreasonable, or unduly preferential or unduly discriminatory.' But the Commission did find that the existing rates were 'unjust and unreasonable,' and Section 6(b) of the Compact[21] gives the Commission authority to modify existing rates upon making such a finding.[22]
 
 
 14
 The interim rate increase in this case was ordered by the Commission during the pendency of a rate proceeding initiated by the carrier's filing of new tariffs, pursuant to Section 6(a) of the Compact. Accordingly, the Commission limited the effectiveness of the interim rates to the period during which it had suspended Transit's proposed tariffs. The rates prescribed by the Interim Order also were designed to do little more than compensate Transit for its operating expenses and the cost of servicing its debt.[23] We do not decide whether in similar circumstances the Commission would have authority to prescribe interim rates to be effective for a period longer than the Section 6(a) suspension period,[24] or higher than necessary to enable the company to 'break even.'
 
 
 15
 From what we have said regarding the Commission's authority to order an interim rate increase, we think it necessarily follows that in doing so it was not required to make the full and complete findings as to margin of return and fare structure that must accompany an exercise of its authority to prescribe permanent rates. This is not to say that its discretion must not be exercised rationally, nor that it may act without making relevant findings, supported by the record, to sustain its action. We hold, however, that given the circumstances presented here-- the inadequacy of the record and the need for further inquiry, the danger of serious consequences to Transit and the public if no fare increase were granted in the interim, and the undesirability of imposing unreasonably high fares on the public-- the Commission's solution was within the bounds of its authority and supported by the findings it made.
 
 II. Suspension Period
 
 16
 Transit filed its proposed schedule of fares on October 17, 1966, and on November 15 the Commission suspended Transit's schedule until February 13, 1967, a period of 120 days from the date of filing. In its Interim Order, the Commission extended the suspension period to March 15, 1967, a period of 150 days from the date of filing. Following this court's stay of the Interim Order, the Commission, on February 1, 1967, reaffirmed the suspension of Transit's proposed schedule of fares until March 15, 1967.
 
 
 17
 Transit contends that the Commission erred in extending the suspension period from 120 to 150 days from the date of filing. It argues that the 120-day suspension period was fixed in 1956 by Section 5 of Transit's Franchise[25] which provided that the 'suspension shall be for a period not to exceed one hundred twenty days from the date (the) new schedule is filed.'The Commission responds that the Franchise suspension period was superseded by a 150-day suspension period in the Compact,[26] which was approved by Congress in 1960. Section 5(e) of the Compact provides that a new fare 'shall take effect * * * at least thirty (30) days after the date on which the tariff is filed, unless the Commission by order authorizes its taking effect on an earlier date.' And Section 6(a)(2) provides that 'the suspension period shall terminate, no later than one hundred and twenty (120) days after the date the fare * * * was suspended.' Thus, under the Compact the fare cannot take effect for 30 days without Commission approval, and the Commission can thereafter suspend the fare for an additional 120 days.
 
 
 18
 The parties agree that the suspension provisions of the Franchise and the Compact are inconsistent. The only question is whether Congress intended that the Compact suspension period supersede the Franchise period.
 
 
 19
 To overcome the usual presumption that a later act supersedes an earlier one, Transit cites the language of Section 3 of the Joint Resolution of Congress approving the Compact:
 
 
 20
 '* * * Nothing in this Act or in the compact consented to and approved hereby shall impair or affect the rights, duties and obligations created by the Act of July 24, 1956 (ch. 699, 70 Stat. 598), granting a franchise to D.C. Transit System, Inc.'[27]
 
 
 21
 It contends that the suspension period is one of 'the rights, duties and obligations created by' the Franchise.
 
 
 22
 In rebuttal, the Commission cites identical language in both the House[28] and Senate[29] committee reports on the Compact stating that 'an examination of the compact will disclose that care has been used to avoid any impairment or infringement of (the Franchise) provisions' dealing with competitive service, rate of return and procedure for changing rates.[30] And, after having made a careful comparison of similar provisions in the two documents for the purpose of demonstrating that there were no substantive differences between the two, both Committees concluded that they were 'compatible.'[31] In short, it appears to us from these statements that, in approving the Compact, Congress made a considered determination that the change in the suspension period from 120 to 150 days was not one of the 'rights, duties and obligations' created under the Franchise.
 
 
 23
 Nor do we believe that, through oversight, Congress failed to take note of the differences in the two documents. It is clear from the committee reports that Transit had called various differences to the attention of the House and Senate committees and, indeed, that Transit had opposed the Compact because of these differences. The reports note:[32]
 
 
 24
 'Argument is made that the legislation would be an impairment of the D.C. Transit System, Inc., franchise and, therefore, unconstitutional. The position of D.C. Transit System, Inc., as the committee understands it, is that under its franchise it has a vested interest in the general regulatory law and the method of its administration existing at the date of the granting of the franchise and that any change in either the laws or the method of administration constitutes a breach of the franchise. Although the company has filed two legal memorandums, the committee feels that the cases and authorities submitted do not support this position. On the contrary, it is well established that the granting of a franchise does not operate as a freeze of all existing law and a prohibition against any change in such laws. The cases and authorities clearly establish that the granting of a franchise does not place the franchised company beyond the continuing regulatory power of the legisalture.'[33]
 
 
 25
 This language would hardly have been necessary had Congress mistakenly believed that the provisions of the Franchise and the Compact were identical.
 
 
 26
 The consistent structure of the Compact also compels the conclusion that Congress intended that the maximum suspension period be set at 150 days. Section 5(e) of the Compact provides that a new tariff filed 'shall state a date on which the new tariff shall take effect, and such date shall be at least thirty (30) days after the date on which the tariff is filed' unless the Commission authorizes an earlier effective date. Section 6(a)(1) states that 'the period of suspension shall terminate ninety (90) days after the date on which the fare * * * would otherwise go into effect, unless the Commission extends such period as provided in paragraph (2).' Finally, Section 6(a)(2) provides that 'the Commission may from time to time extend (the suspension) period, but in any event the suspension period shall terminate, no later than one hundred and twenty (120) days after the date the fare * * * was suspended.' Thus, it is clear that under Section 5(e) a fare normally takes effect 30 days after the tariff is filed; that under Section 6(a)(1) the regular suspension period terminates 90 days after the fares would go into effect, or 120 days from the date of filing, unless the period is extended as provided by Section 6(a)(2); and that Section 6(a)(2) provides for an extension beyond the 120 day period permitted under Section 6(a)(1). Thus, not only the language of Section 6(a)(2) but the structure of the entire Compact sustains the view that a maximum suspension period of 150 days was intended by Congress. And the committee reports of both Houses of Congress support our view of these sections.[34]
 
 
 27
 Moreover, a consequence of adopting Transit's construction would be to single out Transit for a 120 day suspension period while all other carriers in the area were bound by the 150-day period provided in the Compact. We are loath to reach such an inequitable result without a clear statement that Congress so intended it.[35]
 
 
 28
 We conclude that the action of the Commission in suspending Transit's proposed tariffs for a total period of 150 days from the date of filing was lawful, the issue being governed by the suspension provisions of the Compact and not those contained in Transit's Franchise.[36]
 
 III. 1967 Operating Losses
 
 29
 Transit contends that the Commission erred in excluding from the reopened hearings evidence of the company's losses during the first two months of 1967, the future annual period, and that because of the absence of a fare increase in those months it was impossible for the company in 1967 to earn net operating income in the amount approved by the Commission as a fair and reasonable return.
 
 
 30
 The Commission answers this by arguing, first of all, that the future annual year is merely a hypothetical period chosen to facilitate the projection and measurement of future expenses and revenue requirements; that, although the future annual period employed in this proceeding happened to coincide with the year 1967, the Commission 'was setting rates for the future based on projected revenues and expenses of a future 12 month period;' and that since it was not prescribing fares for the actual calendar year 1967, Transit's losses for the first two months of 1967 were irrelevant.
 
 
 31
 We agree with the Commission that it was not bound to fix rates at a level designed to provide the company with net income for the calendar year 1967 in the amount determined by it to represent a fair and reasonable margin of return. In prescribing just and reasonable fares, the Commission necessarily relies on projections of revenues and expenses for a future period chosen for its convenience in estimating operating results under different fare structures.
 
 
 32
 'Usually, where a rate filing is made, the Commission undertakes to establish a rate which it believes, by reason of records and estimates, constitutes a just and reasonable rate for the indefinite future. This process involves the use of statistics of an actual period of twelve months (the historical test year) with an estimate of expected sales and expenses for some months into the future. It is sought by this method to develop a statement of costs and revenues for a normal year from which a just and reasonable rate may be derived for future periods.'[37]
 
 
 33
 The employment of a future year as the basis for projecting operating results is thus simply an evidentiary device to enable concrete discussion and analysis; it is not a recognition that the carrier is necessarily entitled to earn a given amount of profit during that year. Indeed, any other rule would seriously jeopardize the ability of the Commission to prescribe rates which are just and reasonable not only for the present but for the indefinite future as well.[38]
 
 
 34
 The Commission's second point, with which we are also in agreement, is that Transit's position runs afoul of the established ratemaking principle which precludes a utility from charging higher fares in the future in order to recoup past losses.[39] During the reopened hearings, Transit sought to introduce evidence showing the losses it had incurred by virtue of the absence of a fare increase during the first two months of 1967, and requested that these losses be taken into account in establishing a new fare schedule. We think the Commission properly refused to consider this evidence for the purpose for which it was proffered. Past losses, even those incurred as a result of the Commission's exercise of its power to suspend new tariffs, are 'water over the dam.' The company in 'initiating an increase in rates * * * assumes the hazards involved in that procedure,' and it 'can never recoup the income lost when the * * * suspension power of the Commission is exercised * * *.'[40]
 
 
 35
 Transit argues in its reply brief that it 'is not attempting to recoup past losses. Rather, it is insisting that the Commission's projections for the future annual period, reflect actual events in that period.' It is clear, however, that the 'projections' referred to are the Commission's estimates of operating results for the future annual period under the new schedule of fares prescribed by the Final Order. Transit has never in this proceeding suggested that its evidence was relevant as showing losses under existing fares of a greater magnitude than those the Commission had projected in the Interim Order.[41] 'Prophecy, however honest, is generally a poor substitute for experience,'[42] and actual operating results showing losses greater or less than those the Commission had projected might properly have affected the Commission's conclusion as to the need for a fare increase or the amount of increase needed. It is clear, however, that Transit attached no such significance to the evidence it sought to introduce,[43] and there is nothing in the record which indicates that Transit's losses during January and February, 1967 were materially different from those the Commission had projected.[44]
 
 
 36
 We therefore find no reason to disturb the Commission's order for its refusal to receive the proffered evidence, and we hold that it correctly denied Transit's request that it be made whole for the losses incurred because of the absence of a fair increase during the first two months of 1967.
 
 IV. Rate of Return
 
 37
 Both the petitioners in No. 20,988 and Transit in No. 21,029 contend that the Commission erred in finding that a return of $1,900,000 would provide Transit with a fair and reasonable rate of return. We hold that there is substantial evidence in the record to support the Commission's finding.
 
 
 38
 The Commission relied heavily on the testimony of its staff's expert witness who, recognizing that equity holders should be compensated for the risks they undertake, examined the business and financial risks to which Transit was subject. He defined business risks as those of the market place-- changes in demand, technological developments, competitive alternatives-- and concluded that Transit is 'subject to less business risk than other transit firms' because of its large size, its position in a holding company, and its experience of modest growth in ridership as compared with the pattern of declining ridership in the transit industry generally.
 
 
 39
 He defined financial risk as the element of risk voluntarily undertaken by a company through its shaping of its capital structure. On the basis of a comparison of interest on Transit's debt with interest rates on comparable government debt, he found that the difference between them has generally fallen since 1961 even though Transit's debt-equity ratio has increased rapidly. Consequently, he concluded that Transit's high debt-equity ratio did not make it a higher risk investment than other companies. In explanation of this conclusion, he observed that the company's equipment stood as security for lenders; that equity holders were not threatened with a general take-over in the event of default as could be the case with general mortgage bonds; and, of most significance, that the company's real estate subsidiaries provided a limitation on risk.
 
 
 40
 Positing that the equity owner of the company[45] seeks a return on the same level as returns from companies with the same general level of business risk, the Commission's expert witness then derived Transit's estimated cost of equity capital and its estimated overall cost of capital (debt and equity) from estimates of the cost of capital for a group of comparative transit companies. It was thus estimated that the overall cost of capital was 7.05%, which converted into a return of $1,947,800.
 
 
 41
 In concluding that $1,900,000 would be a fair and reasonable return, the Commission noted that this witness's testimony 'had the significant merit of being based upon an assessment of the business and financial risks faced by D.C. Transit with which we are in complete agreement.'[46] It added that 'the analysis specifically took into account a number of factors which we feel are important in reaching a proper conclusion on the fair return,'[47] pointing out that the witness
 
 
 42
 'specifically considered, and took into account, D.C. Transit's own cost of borrowing capital funds and the effect of his conclusions on a continuing ability to borrow funds. He took into account whether the company's debt-equity structure was, and would continue to be, a desirable one, and the effect of that debt-equity structure on the cost of capital. He did not treat the company's past dividends as a fixed and immutable cost. Indeed, his recommendation would undoubtedly lead to a lower dividend than in the past. He gave effect to the company's position in a holding company structure, concluding that it lowered the risks inherent in the transit business and, therefore, the cost of capital. 'He considered the company's working capital needs. He gave effect to the incentives required for the equity holders of the company, including, specifically, opportunities available through alternative use of the equity holders' capital. Finally, he considered the earnings levels of other enterprises which he felt were comparable.'[48]
 
 
 43
 Of the $1,900,000 margin of return it approved, the Commission determined that $1,311,000 would be needed to cover interest payments on the company's debt. And it focused its attention primarily on the appropriateness of the approximately $600,000 thus remaining as a return to the equity holder. In this regard, it found that the net income it projected under the prescribed fares would provide a return on equity of approximately 14%. It compared this figure with the return afforded by other transit companies and concluded that it was reasonable in light of Transit's unusual capital structure and other factors affecting the business and financial risks of Transit and the other companies studied.
 
 
 44
 The Commission also considered evidence in the record which permitted it to compare Transit's earnings with those of other transit companies, as related to total capitalization, gross plant, net plant and gross operating revenues. Though some of these comparisons showed Transit's allowed return 'on the low side of the range,'[49] this was in line with the Commission's finding that 'D.C. Transit has less risk than the average transit company.'[50]
 
 
 45
 The Commission also gave attention to the matter of dividends. It observed that 'we do not consider it our province to dictate the amount of dividends which should be paid. Rather, we should permit a return which will allow the management of the company to pay a sufficient dividend to compete in the capital markets.'[51] Analysis of the company's cash flow and its working capital needs led the Commission to conclude that 'dividends will probably be at a level significantly lower than in some past years.'[52] It did not, however, 'regard this as requiring a larger return.'[53]
 
 
 46
 'The substantial risks the company faced in coming into this community at a difficult time and converting to an all-bus operation with a high standard of service may well have dictated a higher return of capital in past years. As we look at the company now, however, it faces a more secure future than most transit companies, having a modest but definite growth potential. Dividends on the level which seems possible under our return allowance should adequately compensate the equity holder.'[54]
 
 
 47
 We have carefully reviewed the record, and are satisfied that the Commission's findings and conclusions on the subject of rate of return are adequately supported by the evidence, and that the Commission has responsibly exercised its discretion in conformity with the standards enunciated in D.C. Transit System, Inc. v. WMATC, supra. There we observed that the proper margin of return to be allowed over legitimate operating expenses is 'the sum of money needed to attract the capital, both debt and equity, required to insure financial stability and the resulting capacity of the utility to render the service upon which the public depends.'[55] The Commission took account of 'earnings on investments carrying comparable risks,'[56] to arrive at a 'rate * * * that assures that all the enterprise's legitimate expenses will be met, and that enables it to cover interest on its debt, pay dividends sufficient to continue to attract investors, and retain a sufficient surplus to permit it to finance down payments on new equipment and generally to provide both the form and the substance of financial strength and stability,'[57]
 
 
 48
 We are not persuaded by petitioners' argument that the Commission impermissibly rested its determination of a fair return on the 'single narrow economic theory of 'Alternative Use Value," Nor do we find any merit in Transit's contention that the Commission erred in relying on the testimony of the expert witness called by its staff and rejecting in large part the testimony of the company's expert. The Commission's findings, if 'supported by substantial evidence,' are 'conclusive,'[58] and it is not a valid objection that conflicts in the evidence might conceivably have been resolved differently, or other inferences drawn from the same record.
 
 
 49
 We also reject Transit's claim that the Commission's order must be set aside because it approved of a rate of return on gross operating revenues lower than that authorized in the next preceding rate proceeding and because the return allowed was not calculated to permit Transit to pay dividends as great as those paid in prior years. 'A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.'[59] Since the Commission's findings and conclusions must be based on a record reflecting current conditions, it is neither required nor permitted to give conclusive weight to past return allowances[60] or to treat dividend payouts of prior years as a matter of right.[61]
 
 
 50
 We therefore affirm the Commission's finding that a margin of return of $1,900,000, representing a rate of return on gross operating revenues of 5.24%, was fair and reasonable.
 
 V, Fair Structure-- Discrimination
 
 51
 A determination as to the margin of return which the company is to be permitted to earn does not, of course, exhaust the issues relevant to the setting of just and reasonable fares. There still remains the problem-- in many ways more complex and challenging than the question of fair return-- of fixing a specific schedule of rates designed to produce the revenues to which the company is entitled, and by doing so to apportion the cost of service among the individuals and groups who comprise the busriding public.[62] The Commission is required to consider not only the justness and reasonableness of fares charged or proposed to be charged by the carrier, in the sense of meeting overall revenue requirements, but also whether such fares are 'unduly preferential or unduly discriminatory either between riders or sections of the Metropolitan District.'[63]
 
 
 52
 In their motion filed at the close of the Commission hearing, as well as in their petition for reconsideration, petitioners claimed that the absence of an inquiry into Transit's costs and earnings by route precluded a reasoned choice of a nondiscriminatory fare structure, They adverted to evidence in the record suggesting that central city bus operations were more profitable than, and thus were subsidizing to some degree, the suburban operations, and requested a 'scientific study' of the costs of providing service along Transit's various routes and to the different sections of the metropolitan area.
 
 
 53
 The Commission rejected petitioner's contentions and refused to 'defer changes in the rate structure until a 'scientific study' of this subject can be made.'[64] It rested this decision essentially on two grounds: (1) that cost studies of the sort requested by petitioners are not 'indispensable' to the setting of just and reasonable fares;[65] and (2) that in any event, no 'scientific' breakdown of system costs by route or geographical area can be made.[66] The Commission concluded that the fares it prescribed were 'not unduly preferential nor unduly discriminatory either between riders or sections of the Metropolitan District.'[67]
 
 
 54
 We cannot concur in the Commission's view that cost considerations need not be taken into account in determining whether fares are unduly preferential or discriminatory. The problem, as we have said, is one of fairly and rationally apportioning the burden of supplying the company's revenues among the persons who make use of the service it provides. At least where there is no such similarity of conditions as to warrant the inference that material differences in cost do not exist, this would seem to require some attempt to analyze the costs of providing the various services for which fares are exacted.[68]
 
 
 55
 Petitioners suggested that differences in length of ride, passenger density and other factors affecting the costs of providing service, might warrant fare differentials where none now exist or greater differentials than those now in effect.[69] In particular, they stress that District of Columbia operations, because of their apparently greater profitability, were subsidizing suburban operations.[70] Nevertheless, without making any effort to allocate the company's overall cost of service among its routes and services, the Commission concluded that the prescribed fares were not unduly preferential or discriminatory. Though recognizing the difficulties posed by the task of establishing a reasonable fare structure for an urban transit company, we think the Commission should not have dismissed petitioners' contentions out of hand.[71]
 
 
 56
 However, despite our conclusion that some attention to allocated costs is essential, by no means do we suggest that cost is the only element to be considered. We recognize that it would no doubt be impossible, even if desirable, to formulate rates with such precision that each passenger is made to bear the exact cost of the service he receives.[72] Moreover, neither the Compact nor established principles of public utility ratemaking so require; it is only fares that are 'unduly preferential or unduly discriminatory' that are prohibited.[73] Considerations both of policy and of practicality may thus warrant some departure from a strict cost of service standard.
 
 
 57
 In concluding that cost allocation was not 'indispensable,' the Commission apparently relied on two related grounds: (1) that 'value of service' principles justified the refusal to follow a strict cost approach; and (2) that the need to avoid automobile traffic congestion and to maintain a viable area-wide transit system dictated a fair structure which imposed a disproportionate share of system costs on central city operations. Without denying the importance of these considerations, we are nevertheless of the opinion that before they could properly be taken into account an initial inquiry into allocated costs was necessary.
 
 
 58
 'Value of the service' is a concept frequently employed by ratemaking authorities in dealing with the problem of price relationships. Simply stated, the value-of-service approach looks to demand factors, or 'what the traffic will bear,' in apportioning fixed costs among customers or classes of customers.[74] In one sense, employment of a value-of-service approach in ratemaking contexts is anomalous since it sanctions one of the very consequences of monopoly power that public utility regulation was designed to forestall-- namely, the ability of the monopolist to maximize his profits by altering his prices for the same product or service according to the ability or willingness of the particular customer to pay.[75] Nevertheless, value-of-service principles have been widely employed in ratemaking, chiefly on the ground that so long as some contribution to the company's 'overhead' is made by business which, though relatively unprofitable, could not be attracted at a higher price, all farepayers-- even those 'discriminated' against-- are benefited.[76] The theory is, in other words, that a fare structure which, strictly speaking, is discriminatory may nevertheless result in lower fares to the public as a whole.[77] Two conditions, however, are essential to the validity of this reasoning: (1) the lower-price service[78] must at least provide revenues sufficient to cover its incremental, or direct, costs and in addition make some contribution to joint, or fixed, costs; and (2) the demand for the lower-price service must be such that if the price were increased its users would discontinue their patronage.[79]
 
 
 59
 In its opinion, the Commission noted that 'there are theorists who argue that 'the rates charged those customer classes whose demand is relatively inelastic should include a greater proportion of joint costs than the rates charged customer classes characterized by a comparatively elastic demand."[80] It added that
 
 
 60
 'The suburban portions of the company's service were shown in this record to be the areas where the company is experiencing a growth pattern. It is this growth pattern which permitted us to establish a lower rate of return than would otherwise have been possible. It would be folly to stifle that growth by imposing a rate structure which would discourage the use of public transportation.'[81]
 
 
 61
 Similarly, as to charter and 'off peak' service, the Commission said:
 
 
 62
 'One major point that must be mentioned in this context is the labor contract under which D.C. Transit schedules its service. Each operator is guaranteed a minimum of eight hours of pay per day. Thus, many charter and contract runs, occurring in the off-peak hours are operated by personnel who otherwise would be idle, and would be nevertheless paid what is known as 'makeup' time at regular rates of pay. Thus, although off-peak operations are being charged at full rates of pay for operators in Exhibit S-11, because this is what the subsidy law requires, the fact remains that the availability of this type of service, and the revenue therefrom, acts only to relieve the regular operations of an additional cost burden.'[82]
 
 
 63
 The Commission's assumption thus seems to have been that the farepayers as a whole are benefited by the less profitable suburban, charter and contract services. But it made no findings, and we are pointed to no evidence in the record, that these services generate revenues sufficient to cover their incremental costs plus some contribution to joint costs,[83] nor that the demand for them would be materially decreased by higher fares.[84] Absent such findings, value-of-service principles do not support the Commission's conclusions that the fares it prescribed were not unduly discriminatory.[85]
 
 
 64
 As to the need for area-wide service, the Commission had this to say:
 
 
 65
 'The function of a public mass transit system is to provide public transportation on a rational basis for the entire area served by the system. It is inherent in that objective that some routes will not produce revenues equal to the costs involved in providing the service. Service could not be denied to such areas since this would either deprive residents thereof entirely of transportation or force them into the use of their own automobiles, thus increasing traffic congestion and defeating the overall purpose of a mass transit system. Nor is the answer simply to raise the price of service to such areas to a level which will cover costs. As soon as transit fares become roughly comparable to the cost of operating a private vehicle, the rider will switch to his automobile, again defeating the end sought by having a mass transit system. Indeed, it is probable that the cost of public transportation must be kept considerably under that of private transportation to retain transit riders who would otherwise be attracted by the convenience of using their own vehicles. Thus, we feel that the basic premise of Movants' suggestion is highly questionable in terms of sound transportation planning.'[86]
 
 
 66
 The Commission also pointed to language in the Compact in which it found an 'implication that a just and reasonable rate need not be one which is based on a cost of service concept:'
 
 
 67
 'The fact that a carrier is operating a route or furnishing a service at a loss shall not, of itself, determine the question of whether abandonment of the route or service over the route is consistent with the public interest as long as the carrier earns a reasonable return.'[87]
 
 
 68
 There can be little doubt that one of the primary purposes behind the negotiation and approval of the Compact was to promote mass transit service throughout the metropolitan area, thereby relieving traffic congestion in the District of Columbia-- a goal which had previously been frustrated in large part by the fragmentation of transit regulatory responsibility among the three sovereignties comprising the metropolitan area.[88] And we would intrude beyond our province were we to disturb measures taken by the Commission which are reasonably related to and in furtherance of that policy. On the present record, however, we are not satisfied that the Commission has exercised its discretion with due attention to those factors and considerations which alone could supply a rational basis for its action.
 
 
 69
 The Commission implied that fares for suburban service could not be raised to compensatory levels without markedly reducing the demand for that service, noting that 'as soon as transit fares become roughly comparable to the cost of operating a private vehicle, the rider will switch to his automobile.' But this pivotal assumption, that higher fares would suppress the demand for suburban service to a point inconsistent with the public interest, is supported by no findings of the Commission nor, so far as we can tell, by any evidence in the record.[89]
 
 
 70
 Nor do we think the policy in favor of area-wide transit service warrants a blanket disregard of the factor of allocated costs. To be sure, if there is a need for suburban service and if that service cannot be made to pay its way, the public interest may require that it be rendered at less than its cost. But in considering this question, the Commission cannot escape its obligation, at least as an initial matter, to inquire into and consider the cost of the service and its revenue-producing potential. It might be that the market would bear fares which, though not fully compensatory, served at least to cover incremental costs. If that were the case, provision of the service at the highest fare level consistent with its continued vitality would not constitute a burden on other farepayers.[90] Quite a different picture would be presented if the service were being operated at an out-of-pocket loss. In that event, other riders would in effect be paying higher fares in order to sustain suburban service, and the Commission would have to weigh the need for its continued utilization against the unfairness so occasioned. The Commission, in other words, would have to ponder whether the public interest could be thought to require that the inhabitants of the densely populated areas of the central city, by subsidizing the service provided to suburban riders, bear the expense of alleviating the District's traffic problems.[91] Such a sensitive balancing of the interests involved is necessary, in our view, to the establishment of a proper fare structure, and requires considerably more attention to cost considerations than was given by the Commission here.
 
 
 71
 In addition to the policy reasons discussed above, the Commission in its opinion stressed the difficulty of ascertaining the costs attributable to particular routes or geographical areas:
 
 
 72
 'Movants ask for a 'scientific study' to determine the profitability of specific routes. They thus imply that it would be possible to reach a specific and fixed answer as to the cost of operating a given line and the profits being earned thereon. In fact, this could never be done because there is no fixed and knowable answer as to what such costs are. To achieve such a result, the thorny problem of allocating joint costs would first have to be overcome.
 
 
 73
 'Every line in the company's operation not only bears those costs directly attributable to it but it must also be assigned some portion of the myriad costs which are common to all lines. The assignment of these joint costs could be based on any one or more of dozens of factors, and any particular basis would have many arguments both for and against it. This is not to say that some answer could not be reached but to regard it as a 'scientific' result would be sheer naivete. In fact, the answer would involve judgment piled upon judgment.'[92]
 
 
 74
 We do not understand the Commission by this to suggest that it is impossible or impracticable to calculate the direct or incremental costs of specific services.[93] The Commission's concern rather seems to have been with the 'thorny problem of allocating joint costs.' We have no hesitation in agreeing with the Commission that allocation of fixed costs is a challenging and perplexing problem. It is also one that, to some extent at least, involves choices between competing values and is thus not susceptible of precise or 'scientific' solutions.[94] But that the process of cost allocation demands the application of informed judgment, or even 'judgment piled upon judgment,' in no sense warrants the Commission's dispensing with such an inquiry altogether.[95] The point is that without assembling relevant cost information the Commission lacks the raw material for analysis.[96] And it is precisely because it has been entrusted with the responsibility for resolving the difficult problems involved that the Commission's decision may not be made abstractly, or by guesswork.
 
 
 75
 Nothing in the present record convinces us that an allocation of costs upon some reasoned basis is beyond the capabilities of the Commission.[97] For several years, it has employed 'joint product' cost studies, allocating costs on a fullydistributed basis between suburban and District of Columbia operations, for the purpose of determining Transit's eligibility for the school fare subsidy authorized by Congress.[98] Though somewhat different criteria and methods of allocation may govern the question of fare discrimination,[99] we think it is significant that the Commission has found no insuperable obstacle to the cost analyses made necessary by the school fare subsidy issue.[100] And sophisticated schemes of cost accounting have been devised under other regulatory regimes as a basis for prescribing nondiscriminatory rates.[101]
 
 
 76
 Petitioners' contentions before the Commission, as we have indicated, were primarily focused on the allegedly greater profitability of central city than suburban operations. The present fare structure already contains differentials between service within the District of Columbia and that which extends to the suburbs, and among a number of zones and classes of service in suburban areas. The problem of discrimination raised by petitioners could, therefore, be viewed in part as one of allocating the present fare increase among existing fare classifications, or at most of ordering fare reductions for certain existing classifications. In other words, a possible response to the problem might simply be to order adjustments in fare differentials within the framework of the present fare structure. But the question raised by petitioners in its pleadings before the Commission has, we think, a broader reach which deserves the Commission's earnest investigation in a proceeding for that purpose-- the question whether and to what extent the design of Transit's fare structure should be revised to permit more equitable apportionment of the cost of service among customers and classes of customers.
 
 
 77
 For example, we note that the present fare structure contains a uniform fare for travel within the District of Columbia. Thus no allowance is made, as to travel within the District, for such obvious cost-affecting factors as distance travelled or passenger density.[102] A uniform fare undeniably has the salutary effect of enhancing the mobility of city residents.[103] Moreover, simplicity and ease of collection are recognized rate-making goals.[104] These and other considerations might well lead the Commission to conclude that it would be undesirable to depart from the present uniform fare. We do think, however, that the time has come for the Commission to make a thorough and painstaking evaluation of the whole problem of rate design throughout the metropolitan area, with a view toward such modifications-- whether by creating new fare differentials or by adjusting those that now exist, or both-- as are necessary to produce a fare structure that is rational, fair, and neither 'unduly preferential nor unduly discriminatory.'
 
 
 78
 The case will therefore be remanded to enable the Commission to conduct such a study. We wish to make clear however, that we do not view our holding in this regard as requiring that the rate increases ordered by the Commission be rescinded, and we leave the matter of any immediate fare adjustments to the Commission's discretion. For though we have rejected the Commission's reasons for refusing to inquire further into the question of fare discrimination, we do not think the circumstances required that the rate increases requested by Transit be delayed until such an inquiry could be made. We note especially that considerable time had already been expended in the Commission's effort to deal conscientiously with the fair return issue, and that, as found by the Commission's Interim Order, Transit had urgent need for higher fares. Moreover, though the issues raised by petitioners were, in the context of the Commission's past regulatory practice, novel and far-reaching,[105] they were not raised until the final stages of the proceeding.[106] For these reasons we think the Commission, balancing the possibility of unfairness to particular customers or classes of customers against the company's immediate need for increased revenues, might have deferred consideration of the questions relating to discrimination while granting Transit's request for a fare increase.[107] And we hold that it is within the Commission's discretion to follow that course on remand.
 
 
 79
 The case is remanded to the Commission for its further inquiry into and consideration of the question whether the fares charged by Transit are unduly discriminatory. In all other respects the orders under review are affirmed.
 
 
 80
 So ordered.
 
 
 
 [1]
 The new tariffs proposed by Transit raised the price of tokens from four for 85 cents to four for one dollar. They added a five-cent transfer charge, and generally increased zone and express rates both within and without the District of Columbia. Fares in some outermost suburban zones were reduced slightly
 
 
 [2]
 Order No. 646 (unreported) (WMATC Oct. 21, 1966)
 
 
 [3]
 Order No. 651 (unreported) (WMATC Nov. 15, 1966). The procedure for filing and the Commission's authority to suspend new tariffs and prescribe just and reasonable fares are governed by the following sections of Title II, Article XII of the Washington Metropolitan Area Transit Regulation Compact, which is set forth after D.C.Code 1-1410 (1967):
 '5(e) Any carrier which desires to change any fare specified in a tariff filed by it under this section, or any regulation or practice specified in any such tariff affecting such a fare, shall file a tariff in compliance with this section showing the change proposed to be made and shall give notice to the public of the proposed change by posting and filing such tariff in such manner as the Commission may by rule, regulation or order provide. Each tariff filed under this subsection shall state a date on which the new tariff shall take effect, and such date shall be at least thirty (30) days after the date on which the tariff is filed, unless the Commission by order authorizes its taking effect on an earlier date.
 '6(a) (1) The Commission, upon complaint or upon its own initiative, may suspend any fare, regulation, or practice shown in a tariff filed with it under Section 5 (except a tariff to which Section 5(b) applies), at any time before such fare, regulation, or practice would otherwise take effect. Such suspension shall be accomplished by filing with the tariff, and delivered to the carrier or carriers affected thereby, a notification in writing of such suspension. In determining whether any proposed change shall be suspended, the Commission shall give consideration to, among other things, the financial condition of the carrier, its revenue requirements, and whether the carrier is being operated economically and efficiently. The period of suspension shall terminate ninety (90) days after the date on which the fare, regulation, or practice involved would otherwise go into effect, unless the Commission extends such period as provided in paragraph (2).
 '6(a) (2) If, after hearing held upon reasonable notice, the Commission finds that any fare, regulation or practice relating thereto, so suspended is unjust, unreasonable, or unduly preferential or unduly discriminatory either between riders or sections of the Metropolitan District, it shall issue an order prescribing the lawful fare, regulation, or practice to be in effect. The fare, regulation, or practice so prescribed shall take effect on the date specified in such order. If such an order has not been issued within the ninety (90) day suspension period provided for in paragraph (1), the Commission may from time to time extend such period, but in any event the suspension period shall terminate, no later than one hundred and twenty (120) days after the date the fare, regulation or practice involved was suspended. If no such order is issued within the suspension period (including any extension thereof), the fare, regulation or practice involved shall take effect at the termination of such period.'
 
 
 [4]
 Order No. 656 (unreported) (WMATC Jan. 12, 1967)
 
 
 [5]
 Id. at 24. The order raised the price of tokens from four for 85 cents to four for 95 cents, eliminated the transfer charge, and granted increases in suburban fares considerably lower than those the company had requested
 
 
 [6]
 Ibid
 
 
 [7]
 Order No. 658 (unreported) (WMATC Jan. 20, 1967)
 
 
 [8]
 Order No. 684 (unreported) (WMATC March 13, 1967)
 
 
 [9]
 The fares approved were essentially the same as those prescribed by the Interim Order, except that the token fare was set at four for 98 cents instead of four for 95 cents
 
 
 [10]
 Order No. 692 (unreported) (WMATC April 14, 1967)
 
 
 [11]
 Order No. 691 (unreported) (WMATC April 12, 1967)
 
 
 [12]
 An additional contention, relating to the Commission's projection of Transit's income tax expense for the future annual period, was abandoned at oral argument
 
 
 [13]
 Order No. 656, supra note 4, at 18
 
 
 [14]
 Id. at 24
 
 
 [15]
 Id. at 31
 
 
 [16]
 Id. at 22
 
 
 [17]
 Compact, supra note 3, tit. II, art. XII, 6(a)(2)
 
 
 [18]
 Order No. 656, supra note 4, at 23
 
 
 [19]
 The New England Division Case, 261 U.S. 184, 201, 43 S.Ct. 270, 277, 67 L.Ed. 605 (1923); see FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 583-585, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); McManus v. CAB, 310 F.2d 762, 763 (2d Cir. 1962); Panhandle Eastern Pipe Line Co. v. FPC, 236 F.2d 606, 608-609 (3d Cir. 1956)
 
 
 [20]
 Note 3, supra
 
 
 [21]
 Compact, supra note 3, tit. II, art. XII, 6(b):
 'Whenever, upon complaint, or upon its own initiative, and after hearing held upon reasonable notice, the Commission finds that any individual or joint fare in effect for transportation subject to this Act, or any regulation or practice affecting such fare, is unjust, unreasonable or unduly preferential or unduly discriminatory, the Commission shall issue an order prescribing the lawful fare, regulation, or practice thereafter to be in effect.'
 
 
 [22]
 This court's order of January 27, 1967, staying the Commission's Interim Order, recited the Commission's failure to make the findings required by 6(a) (2) and stated that 'the Commission has issued its purported 'interim' order without having made findings to support said interim order in conformity with and otherwise requisite to Commission action 'prescribing the lawful fare * * * to be in effect." However, the court in issuing its order apparently was not made aware of the Commission's authority under 6(b) to prescribe 'the lawful fare * * * thereafter to be in effect' upon a finding that the existing rate is 'unjust and unreasonable.' Moreover, a ruling on a motion for stay of an agency action is not a final and conclusive determination of the merits of the controversy, but rather entails the weighing of a number of considerations, only one of which is the likelihood of success on the merits. Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958). Cf. Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 56, 405 F.2d 1321 (1968)
 
 
 [23]
 The interim rates were designed to provide net revenues of $1,520,323, of which $1,311,000 would be needed to cover interest on the company's debt
 
 
 [24]
 At oral argument on this appeal, counsel for the Commission took the position that it would not have such authority
 
 
 [25]
 Pub.L. 85-757, 70 Stat. 598 (1956)
 
 
 [26]
 Note 3, supra
 
 
 [27]
 D.C.Code, 1-1412 (1967)
 
 
 [28]
 H.R.REP. NO. 1621, 86th Cong., 2d Sess. (1960)
 
 
 [29]
 S.REP. NO. 1906, 86th Cong., 2d Sess. (1960)
 
 
 [30]
 H.R.REP. NO. 1621, supra note 28, at 26; S.REP. NO. 1906, supra note 29, at 29
 
 
 [31]
 Ibid
 
 
 [32]
 H.R.REP. NO. 1621 supra note 28, at 24-25; S.REP. NO. 1906, supra note 29, at 28
 
 
 [33]
 Though there is a suggestion that constitutional objections were raised before Congress, none has been raised here, and we approach this issue solely as a question of statutory interpretation
 
 
 [34]
 H.R.REP. NO. 1621 supra note 28, at 11-12; S.REP. NO. 1906, supra note 29, at 13
 
 
 [35]
 It should be noted too that on the last previous occasion that Transit filed an application for a fare increase, the Commission initially suspended the proposed fare, apparently without protest from Transit, from September 17, 1965, until February 5, 1966, a period of 141 days; and the Commission's final order denying the proposed increase was issued on January 26, 1966, 131 days from the date of filing. See In re D.C. Transit Sys., Inc. (Order No. 564), 63 P.U.R. 3d 45, 47 (1966)
 
 
 [36]
 In view of our disposition, we find it unnecessary to determine whether an appropriate remedy could be devised in the event we were to hold in Transit's favor, since Transit did not act to assert its legal claim by commencing to collect fares in accordance with its proposed schedule after 120 days had passed from the date of filing
 
 
 [37]
 Michigan Wisconsin Pipe Line Co. v. FPC, 263 F.2d 553, 555 (6th Cir. 1959)
 
 
 [38]
 Cf. McCardle v. Indianapolis Water Co., 272 U.S. 400, 408-409, 47 S.Ct. 144, 71 L.Ed. 316 (1926). It is for this reason that abnormal, non-recurring items in the historical test period or future annual period must be eliminated. United Gas Pub. Serv. Co. v. State of Texas, 303 U.S. 123, 145, 58 S.Ct. 483, 82 L.Ed. 702 (1938); Michigan Wisconsin Pipe Line Co. v. FPC, supra note 37, 263 F.2d at 555, 557. Given the accuracy of the Commission's finding that $1,900,000 would be a fair return, Transit was entitled to fares that would permit it to earn net income in that amount over twelve months, and not some lesser period, in the future
 
 
 [39]
 FPC v. Natural Gas Pipeline Co., supra note 19, 315 U.S. at 590, 62 S.Ct. 736, 86 L.Ed. 1037; Board of Public Utility Commissioners v. New York Tel.Co., 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808 (1926); Georgia Ry. & Power Co. v. Railroad Comm'n of Georgia, 262 U.S. 625, 632, 43 S.Ct. 680, 67 L.Ed. 1144 (1923); Galveston Elec. Co. v. City of Galveston, 258 U.S. 388, 395, 42 S.Ct. 351, 66 L.Ed. 678 (1922); cf. Board of Public Utility Commissioners v. New York Tel. Co., supra, 271 U.S. at 32, 46 S.Ct. at 70 L.Ed. 808
 
 
 [40]
 FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 152 (1962)
 
 
 [41]
 Transit stated in its motion for reconsideration that
 'The Commission erred in finding that Transit would have net operating income in the amount of $1,903,763 and a rate of return on gross operating revenues of 5.24% In the future annual period, 1967, the return which the Commission decided was fair and reasonable, because the fare structure authorized by the Order will not be in effect for the full year.'
 
 
 [42]
 West Ohio Gas Co. v. Public Utils. Comm'n of Ohio, 294 U.S. 79, 82, 55 S.Ct. 324, 325, 79 L.Ed. 773 (1935)
 
 
 [43]
 See note 41, supra. In requesting admission of the evidence at the Commission hearing, counsel for Transit made clear that the purpose for which it was proffered was to enable the Commission 'to make an adjustment in the future annual period in gross revenues by the amount under any (of the various fare structures under consideration) * * * that the company did not in the future annual period achieve the desired revenues.' In rejecting the evidence for this purpose, the Chairman of the Commission pointed out that 'the Commission has already determined that the company has been suffering a loss since the first of the year.'
 
 
 [44]
 Actually, the exhibits proffered showed that Transit had earned approximately $79,000 more than would have been consistent with the Commission's projections. Counsel for Transit attributed this discrepancy to the higher revenues generated by the interim fares during the brief period they were in effect
 
 
 [45]
 Transit is the wholly owned subsidiary of D.C. Transit System, Inc., a Delaware Corporation
 
 
 [46]
 Order No. 684, supra note 8, at 23
 
 
 [47]
 Id. at 23-24
 
 
 [48]
 Id. at 24
 
 
 [49]
 Id. at 28
 
 
 [50]
 Ibid
 
 
 [51]
 Id. at 31
 
 
 [52]
 Ibid
 
 
 [53]
 Ibid
 
 
 [54]
 Ibid
 
 
 [55]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [56]
 Ibid
 
 
 [57]
 121 U.S.App.D.C. at 400, 350 F.2d at 778
 
 
 [58]
 Compact, supra note 3, tit. II, art. XII, 17(a)
 
 
 [59]
 Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of State of West Virginia, 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923)
 
 
 [60]
 Capital Transit Co. v. Public Utils. Comm'n of District of Columbia, 93 U.S.App.D.C. 194, 204-206, 213 F.2d 176, 185-188 (1953), cert. denied 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 643 (1954) (opinion of Chief Judge Stephens); Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 121, 188 F.2d 11, 17 (1950), cert. denied 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951); In re New England Tel & Tel. Co., 120 Vt. 181, 136 A.2d 357, 364-365 (1957)
 
 
 [61]
 See Williams v. WMATC, 134 U.S.App.D.C. , 415 F.2d 922, pp. 929-930, 969-971, decided this day; D.C. Transit Sys., Inc. v. WMATC, supra, 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [62]
 Bonbright, Principles of Public Utility Rates 287 (1961); Hale, Commissions, Rates and Policies, 53 Harv.L.Rev. 1103, 1118 (1940)
 
 
 [63]
 Compact, supra note 3, tit. II, art. XII, 6(a)(2)
 
 
 [64]
 Order No. 684, supra note 8, at 40
 
 
 [65]
 Id. at 44-45
 
 
 [66]
 Id. at 44
 
 
 [67]
 Id. at 46
 
 
 [68]
 Public Serv. Comm'n of Utah v. United States, 356 U.S. 421, 78 S.Ct. 796, 2 L.Ed.2d 886 (1958); Chicago, Milwaukee, St. Paul & Pac. R.R. v. Illinois, 355 U.S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292 (1958); State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945); Capital Transit Co. v. Public Utils. Comm'n, supra note 60. Although these cases dealt with the situation where a utility's operations are regulated by more than one jurisdiction, we find no basis for distinguishing them on that ground. See Capital Transit Co. v. Public Utils. Comm'n, supra note 60, 93 U.S.App.D.C. at 198 n. 4, 213 F.2d at 179 n. 4, 93 U.S.App.D.C. at 206-212, 213 F.2d at 188-194 (opinion of Chief Judge Stephens). Alabama Great Southern R.R. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951), is not to the contrary since it involved intermodal rate differentials as to which the usual prohibition against discrimination was expressly made inapplicable by the proviso in 49 U.S.C. 905(c)
 
 
 [69]
 There would seem to be no basis for concluding that the 'same conditions prevail,' Capital Transit Co. v. Public Utils. Comm'n, supra note 60, 93 U.S.App.D.C. at 201, 213 F.2d at 182, when one passenger, for example, rides ten miles, and another ten blocks. See Interstate Power Co. v. FPC, 236 F.2d 372, 379 (8th Cir. 1956), cert. denied 352 U.S. 967, 77 S.Ct. 352, 1 L.Ed.2d 321 (1957)
 
 
 [70]
 Petitioners based their contention largely on a Commission exhibit which showed that Maryland interstate service was being operated at a loss of 13 cents per mile, while District of Columbia service was earning a profit of 16 cents per mile
 
 
 [71]
 We are clear that the cost element is at the heart of the concept of price discrimination, notwithstanding the difficulty of determining the 'cost' of a particular product or service, and whatever reasons there may be for departing from a strict cost standard in fixing rates. The classic example of discrimination, of course, is where one customer is charged a higher price than another for the identical product or service. Dam, The Economics and Law of Price Discrimination, 31 U.Chi.L.Rev. 1, 4 (1963); see Interstate Commerce Act 2, 49 U.S.C. 2 (1964). But discrimination also exists where equal rates are charged for services whose rates ought to be different, or where, though the lower cost service is provided at a lower price, the difference in the costs of providing the two services requires a greater differential than in fact exists. Bonbright, supra note 62, at 374; Dam, supra, at 4-7; Hale, supra note 62, at 1105; see Capital Transit Co. v. Public Utils. Comm'n, supra note 60, 93 U.S.App.D.C. at 201, 213 F.2d at 183; Interstate Power Co. v. FPC, supra note 69; Interstate Commerce Act 3, 49 U.S.C. 3 (1964)
 
 
 [72]
 Bonbright, supra note 62, at 296-97
 
 
 [73]
 Compact, supra note 3, tit. II, art. XII, 6(a)(2); see New York v. United States, 331 U.S. 284, 305, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352-353, 60 S.Ct. 931, 84 L.Ed. 1243 (1940)
 
 
 [74]
 Bonbright, supra note 62, at 378
 
 
 [75]
 See New York, N.H. & H. R.R. v. United States, 199 F.Supp. 635, 643 (D.Conn.1961), vacated and remanded sub non. I.C.C. v. New York, N.H. & H. R.R., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963); Bonbright, supra note 62 at 378-379; Dam, supra note 71 at 5-6
 
 
 [76]
 Bonbright, supra note 62, at 383; Hale, supra note 62, at 1131; see New York, N.H. & H. R.R. v. United States, supra note 75, at 643
 
 
 [77]
 An illustration is provided in Bonbright, supra note 62, at 309
 
 
 [78]
 By 'lower-price' service we mean any service which, vis-a-vis other services, does not bear a proportionate share of the Company's cost of service. See note 71, supra
 
 
 [79]
 Note 75, supra; Locklin, Economics of Transportation 158 (1954). The latter finding would seem to be a necessary justification for shifting most or all fixed costs to one service while charging another with only its incremental costs. See Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 615, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) (concurring opinion); In re New York State Elec. & Gas Corp., 6 P.U.R (n.s.) 113, 116 (N.Y.Pub.Utils.Comm'n, 1934)
 
 
 [80]
 Order No. 684, supra note 8, at 42 (quoting Garfield & Lovejoy, Public Utility Economics 144 (1964)). As applied to the present situation, presumably this means that city residents who do not own automobiles, and therefore do not have access to alternative means of transportation, should bear a larger portion of joint costs than residents of the suburbs who do own automobiles
 
 
 [81]
 Ibid
 
 
 [82]
 Id. at 43-44
 
 
 [83]
 Though the Commission's Chief Accountant apparently assumed that this was so, id. at 43, neither the Commission nor its staff had made a study of incremental costs which would warrant that assumption, see ibid
 
 
 [84]
 This would seem to require some inquiry into the cost of automobile transportation and other factors affecting the choice of private or public transportation
 
 
 [85]
 Though it is for the Commission, in the exercise of a sound discretion, to say how much discrimination is 'undue,' see note 73, supra, the Commission here never even attempted to discover whether and to what extent discrimination exists
 
 
 [86]
 Order No. 684, supra note 8, at 41
 
 
 [87]
 Compact, supra note 3, tit. II, art. XII, 4(i)
 
 
 [88]
 See Preamble to the Act of September 15, 1960, 74 Stat. 1031, whereby Congress consented to the Compact, D.C.Code 1-1410; Compact, supra note 3, tit. I, art. II, conferring on the Commission responsibility for 'the regulation and improvement of transit and the alleviation of traffic congestion within the Metropolitan District on a coordinated basis, without regard to political boundaries * * *.'
 
 
 [89]
 See note 84, supra
 
 
 [90]
 Notes 76, 77, supra, and accompanying text
 
 
 [91]
 Other sources presumably might be found. Compare the school fare subsidy, discussed in note 98, infra
 
 
 [92]
 Order No. 684, supra note 8, at 44
 
 
 [93]
 Indeed, it appears from the record that Transit makes out-of-pocket cost-per-mile studies, apparently for purposes of deciding whether to request abandonment of lines or services
 We recognize that there are difficulties in certain instances in determining what are properly identified as 'incremental' costs of a service. See, e.g., Bonbright, supra note 62, at 317-336. This, like the problem of allocating fixed costs, is a matter requiring the application of expert judgment by the Commission.
 
 
 [94]
 See Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 214, 163 F.2d 433, 439 (1947); Bonbright, supra note 62 at 289. There is, for example, an initial question whether a 'nondiscriminatory' rate structure is one in which price differentials are equal to or proportional to differences in incremental costs. Bonbright, supra note 62, at 374-378; Dam, supra note 71, at 7. Beyond this, there are numerous considerations, some of which have already been discussed, which may govern the allocation of fixed costs among services. See generally Hale, supra note 62, 1110-1144
 
 
 [95]
 The Commission's Chief Accountant noted that an analysis on 'an incremental cost basis' would require entering the 'very difficult field of qualitative judgment as a means of assigning costs,' and added:
 'But the fact that judgment enters into the assignment of costs on an incremental cost basis does not alter the fact that this is a necessary procedure in evaluating the relative contribution to the health of this company by the charter and contract operations and by the Maryland business.'
 
 
 [96]
 For example, though suggesting that value-of-service principles made cost analysis 'hardly indispensable,' the Commission failed to inquire even into the incremental costs of particular services, evidently overlooking the point that the value-of-service approach is, at most, a justification for choosing a particular allocation of fixed costs, and presupposes that the services in question at least cover their incremental costs
 
 
 [97]
 Since the problems involved are concededly complex and technical, the Commission might want to consider engaging the services of an outside expert, as it did in this case on the fair return question. In an earlier proceeding the Commission retained the Stone and Webster Service Corporation to make a depreciation study of the Company. See In re D.C. Transit Sys., Inc. (Order No. 564), 63 P.U.R.3d 45, 56-57 (1966)
 
 
 [98]
 Reduced fares are provided for schoolchildren by D.C.Code 44-214a (1967), which also authorizes a subsidy to compensate for the lower fares in the amount by which the carrier's 'net operating income from mass transportation operations in the District of Columbia is less than' the return approved in the last rate proceeding. This section thus requires allocation of revenues and expenses in order to determine net income from District of Columbia operations. The Commission exhibit referred to in note 70, supra, embodied the results of the current study made for this purpose
 
 
 [99]
 Apparently no distinction is made for purposes of the school fare subsidy study between incremental and fixed costs, the carrier's undifferentiated expenses being allocated between District of Columbia and Maryland operations. In response to the question whether such a 'joint product' study is a 'proper basis' for establishing a fare structure, the Chief Accountant testified that 'it is a basis and it certainly I think should be given some weight in deciding upon a new fare structure.' When asked whether it would be 'impossible' to break down the Company's cost of service in order to determine the profitability of routes or services, he replied that it 'would be a little difficult. * * * It is not practical.'
 
 
 [100]
 In allocating costs on a 'joint product' basis, for purposes of the school fare subsidy, a complex method is employed, involving six different bases for allocation: revenue; drivers' hours in each activity; mileage; a combination of mileage and passengers; a combination of drivers' hours and passengers; and an average of the mileage-passenger and hours-passengers bases
 
 
 [101]
 See, e.g., New York, N.H. & H.R.R. v. United States, supra note 75, 199 F.Supp., at 647-648. I.C.C., Explanation of Rail Cost Finding Procedures and Principles Relating to the Use of Costs (1954)
 
 
 [102]
 See Compact, supra note 3, tit. I, art. II, quoted in note 88, supra
 
 
 [103]
 In shaping a rational fare structure, the Commission can hardly close its eyes to such considerations even if they be termed 'social' rather than 'economic' or 'transportation' criteria
 
 
 [104]
 Bonbright, supra note 62, at 291
 
 
 [105]
 It is significant, we think, that the issues raised encompassed not only the apportionment of the present fare increase among existing classifications, but also the possible reduction of certain extant fares, and even a revamping of the entire fare structure to provide new classifications and differentials where none had been recognized before. See Bonbright, supra note 62, at 288 n. 1
 
 
 [106]
 We do not suggest that the responsibility for initiating or carrying through essential inquiries, even those involving issues of great magnitude, properly rests with private parties. What we are concerned with here, however, is the reasonableness of deferring consideration of fundamental revisions of the fare structure while acting on Transit's application for a fare increase
 
 
 [107]
 Procedurally, this might have been done by treating petitioner's motion, filed after the record had been closed, as a 'complaint' invoking the Commission's authority under 6(b) of the Compact, supra note 3, tit. II, art. XII. Cf. FPC v. Natural Gas Pipeline Co., supra note 19 at 583-585, 62 S.Ct. 736, 86 L.Ed. 1037