**Leonard N. BEBCHICK et al.,**
**Petitioners,**

**v.**

**WASHINGTON METROPOLITAN AREA**
**TRANSIT COMMISSION,**
**Respondent,**

**D. C. Transit System, Inc. Intervenor.**

**D. C. TRANSIT SYSTEM, INC.,**
**Petitioner,**

**v.**

**WASHINGTON METROPOLITAN AREA**
**TRANSIT COMMISSION,**
**Respondent,**

**Leonard N. Bebchick et al.,**
**Intervenors.**

**Nos. 23720, 23747.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1970.

Decided June 28, 1973.

Rehearing Denied Sept. 25, 1973.

---

Leonard N. Bebchick, Washington, D. C., with whom Stanley O. Sher, Washington, D. C., was on the brief, for petitioners in No. 23720 and intervenors in No. 23747.

Harvey M. Spear, New York City, for petitioner in No. 23747 and intervenor in No. 23720.

Douglas N. Schneider, Jr., Washington, D. C., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

These two cases are here on petitions for review of an order promulgated by the Washington Metropolitan Area Transit Commission following our remand to it of issues remaining for resolution after our decision in Williams v. Washington Metropolitan Area Transit Commission.[1] We find that in several respects the Commission misinterpreted that decision. Consequently, we are compelled to remand again for activities which will enable us to bring this litigation to a conclusion.

## I. BACKGROUND

The history of these proceedings goes back to April 12, 1963, when the Commission, by its Order No. 245,[2] authorized D. C. Transit System, Inc. (Transit), to increase its token fare for passenger transportation within the District of Columbia and its suburbs in Maryland.[3] That order was first brought here for review in D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,[4] but we could find "no intelligible basis" in the record "for disposing of the competing claims" respecting the margin of return allowed.[5] We therefore remanded the case to the Commission for further proceedings.[6]

On January 26, 1966, the Commission, in response to our remand, issued its Order No. 563[7] by which it reaffirmed the result earlier reached in Order No. 245.[8] On the same day, the Commission published its Order No. 564,[9] which dealt with another tariff filed by Transit on the previous September 17. In the latter order, the Commission found that existing rates—those authorized by Order

---

* Sitting by designation pursuant to 28 U.S. C. § 293(a) (1970).

1. 134 U.S.App.D.C. 342, 415 F.2d 922 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

2. D. C. Transit Sys., Inc. (Order No. 245), 48 P.U.R.3d 385 (WMATC 1963).

3. Immediately prior to Order No. 245, the adult cash fare was 25 cents and tokens were sold at 20 cents each, in units of five for $1.00. Order No. 245 permitted an increase in the token fare to 21.25 cents, tokens to be sold in units of four

for 85 cents. Id. at 416–17. No change in the adult cash fare was made, id., or indeed requested.

4. 121 U.S.App.D.C. 375, 350 F.2d 753 (en banc 1965).

5. Id. at 402, 350 F.2d at 780.

6. Id.

7. D. C. Transit Sys., Inc. (Order No. 563), 63 P.U.R.3d 32 (WMATC 1966).

8. Id. at 44.

9. D. C. Transit Sys., Inc. (Order No. 564), 64 P.U.R.3d 45 (WMATC 1966).

No. 245 [10]—would yield an unreasonably low return for the future.[11] Instead of generally increasing fares,[12] however, the Commission permitted Transit to accommodate an expected deficit of about $1,350,000 in revenues by drawing on the riders' fund—a reserve on Transit's books for the benefit of its customers [13] —established pursuant to one of our earlier decisions, Bebchick v. Public Utilities Commission.[14]

Petitions for our review of Orders Nos. 563 and 564 followed, and were disposed of together on October 8, 1968, in *Williams*. We set aside Order No. 563, and consequently Order No. 245 upon which it was based, because the Commission did "not advance a rational basis for its determination of rate of return." [15] We did not remand for the entry of a new fare order, however, because on March 13, 1967, the Commission had issued Order No. 684,[16] which superseded prior fare orders and which we upheld in Payne v. Washington Metropolitan Area Transit Commission,[17] decided on the same day as *Williams*. The Commission, we held in *Williams*, had no "power to devise a new order, *nunc pro tunc*, governing the years intervening between Order No. 245 and the entry of a subsequent order prescribing the 'lawful fare . . . to be in effect.'" [18] From this holding we were led to the conclusion that Transit must be compelled to make restitution for the increased fares it had collected under the unlawful Order No. 245.[19] Because we were "confronted by circumstances indicating a substantial probability that it would be inequitable to compel Transit to restore the entire amount it realized from the fare increase," [20] we further held that Transit would "be permitted to retain any portion of the higher fares necessary to preserve its actual earnings during the years in question at the level conceded by the protestants to represent a fair return." [21] The parties were directed to attempt to reach an agreement, to be approved by the Commission, on the amount to be restored; failing that, the Commission was to "supervise the execution of our mandate." [22]

Like the margin-of-return determination in Order No. 563, Order No. 564 was overturned because "the Commission's findings [did] not justify the return . . . allowed." [23] Since Order No. 564 had also been superseded by Order No. 684 and there were "substantial indications" that it would be inequitable to compel Transit to make full restitution,[24] we fashioned a disposition parallel to that made with respect to Order No. 563.[25] We held that "Transit will be permitted to retain any portion" of the increased fares it collected "which is necessary to preserve its actual earnings during the period covered by Order No. 564 at the level conceded by the

---

10. See note 3, *supra*.

11. D. C. Transit Sys., Inc. (Order 564), *supra* note 9, 63 P.U.R.3d at 58–68.

12. The Commission did allow an increase in the downtown minibus fare, which was not later challenged judicially.

13. See Bebchick v. Public Utils. Comm'n, 115 U.S.App.D.C. 216, 232–233, 318 F.2d 187, 203–204 (en banc), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963).

14. *Supra* note 13.

15. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 358, 415 F.2d at 938.

16. D. C. Transit Sys., Inc. (Order No. 684), (WMATC March 13, 1967) (unreported).

17. 134 U.S.App.D.C 321, 415 F.2d 901 (1968).

18. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 360, 415 F.2d at 940.

19. *Id.* at 360–362, 415 F.2d at 940–942.

20. *Id.* at 364–365, 415 F.2d at 944–945.

21. *Id.* at 366, 415 F.2d at 946 (footnote omitted).

22. *Id.* at 397, 415 F.2d 977 (footnote omitted).

23. *Id.* at 389, 415 F.2d at 969.

24. *Id.* at 395, 415 F.2d at 975.

25. *Id.* at 396, 397, 415 F.2d at 976, 977.

protestants to represent a fair return." [26] We also held that the Commission had erred in Order No. 564 in its treatment of Transit's acquisition adjustment account,[27] a deficiency in its depreciation reserve,[28] its investment tax credits [29] and the amount of its bus maintenance expense.[30] Those issues were remanded for further proceedings consistent with our opinion.[31]

The parties were unable to agree on the amount of restitution, and so the matter came on to be heard by the Commission. On October 17, 1969, the Commission issued Order No. 981 [32] dealing with the issues raised by the *Williams* decision. It is from that order, and the Commission's subsequent denials of reconsideration,[33] that the petitions for review originate.

In No. 23,720 petitioners claim that the Commission erred in holding (a) that Transit had no excess earnings during the periods involved; (b) that Transit's investors had not been reimbursed for the deficiency in the depreciation reserve by unrealized gains in the market value of depreciable properties transferred out of public service; and (c) that it had no authority to award attorneys' fees and litigation expenses to the protestants. We deal with each of these contentions, in the order listed, in Parts II to IV of this opinion. In No. 23,747, Transit argues that the Commission erred (a) in its treatment of the acquisition adjustment account, (b) in failing to award restitution to Transit, and (c) in ordering that its farepayers should reap the benefits of future investment tax credits. These contentions are discussed in Part V. Lastly, our disposition is set forth in Part VI.

## II. EXCESS EARNINGS

### A. *Combination of Periods*

In *Williams*, we set aside two separate fare orders. One was Order No. 245,[34] as supplemented by Order No. 563,[35] which had fixed the fares in effect from April 14, 1963, through January 26, 1966.[36] The other was Order No. 564,[37] which had promulgated the fares in effect from January 27, 1966, through March 14, 1967.[38] At the hearings which followed our remand, it developed that during the period Orders Nos. 245 and 563 were in force, Transit earned more than the amount which the protestants had conceded to be a fair and reasonable return, but that during the period covered by Order No. 564, Transit fell short of earning the concededly fair return. The protestants—petitioners here—argued that Transit should restore all of the excess it earned under Order No. 245 notwithstanding that there were no excess earnings, but actually a deficit in anticipated earnings, for the period covered by Order No. 564. The Commission held, however, that for purposes of determining whether Transit had excess earnings within the intendment of our *Williams* ruling, the two periods should be combined.[39] As a result, Transit did not have to make any restitution to the riders' fund, for using the Commission's method of computation, which is also in dispute, the shortfall in earnings during the period cov-

26. *Id.* at 396, 415 F.2d at 976 (footnote omitted).

27. *Id.* at 367–372, 415 F.2d at 947–952.

28. *Id.* at 372–378, 415 F.2d at 952–958.

29. *Id.* at 378–383, 415 F.2d at 958–963.

30. *Id.* at 385–388, 415 F.2d at 965–968.

31. *Id.* at 397, 415 F.2d at 977.

32. D. C. Transit Sys., Inc. (Order No. 981), 81 P.U.R.3d 113 (WMATC 1969).

33. D. C. Transit Sys., Inc. (Order No. 995) (WMATC Nov. 28, 1969) (unreport-

ed) ; D. C. Transit Sys., Inc. (Order No. 1005) (unreported).

34. *Supra* note 2.

35. *Supra* note 7.

36. See D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 115.

37. *Supra* note 9.

38. See D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 115.

39. *Id.* at 134.

ered by Order No. 564 was greater than the excess earned during the period covered by Order No. 245.[40] We hold that in combining the periods, the Commission misinterpreted our *Williams* decision.

As careful reading of the *Williams* opinion reveals, we treated the orders involved separately. The structure and content of the opinion, from beginning to end, recognized the independence of the two orders.[41] Furthermore, the language we employed in holding that Transit should restore only so much of the increased fares as exceeded the amount conceded by the protestants to be fair shows that we contemplated separate determinations of earnings liable for restitution.[42] But despite its apparent appreciation of these factors, the

---

**40.** As the Commission calculated actual earnings and conceded return, the figures were these:

| | Actual Return | Conceded Return |
| --- | --- | --- |
| Order No. 245 (4/14/63–1/26/66) | $4,531,179 | $3,689,867 |
| Order No. 564 (1/27/66–3/14/67) | 762,788 | 1,965,003 |
| Cumulative (4/14/63–3/14/67) | $5,293,967 | $5,654,870 |

See *id.* at 139. The protestants took issue with the computation, both as to the actual return (based on the treatment of the deficiency in the depreciation reserve, see Part III, *infra*) and the conceded return (see Part II(B), *infra*). Their figures are these:

| | Actual Return | Conceded Return |
| --- | --- | --- |
| Order No. 245 (4/14/63–1/26/66) | $4,549,179 | $3,087,423 |
| Order No. 564 (1/27/66–3/14/67) | 997,477 | 1,749,950 |
| Cumulative (4/14/63–3/14/67) | $5,546,656 | $4,837,373 |

(Brief for Petitioners at 3). Based on these calculations, protestants claim the excess earnings under Order No. 245—$1,461,756—should be placed in the riders' fund.

---

**41.** We dealt with the orders independently throughout the body of the opinion, and as well in our "Summary" which we prepared "for the convenience of the parties and the Commission." Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 396–397, 415 F.2d at 976–977.

**42.** With respect to Order No. 245, we said that "Transit will be permitted to retain any portions of the higher fares necessary to preserve its actual earnings *during the years in question* at the level conceded by the protestants to represent a fair return." *Id.* at 366, 415 F.2d at 946 (emphasis added). We also said that "the years in question" meant "the period during which Order No. 245 . . . was in effect." *Id.* at 366 & n. 121, 415 F.2d at 946 & n. 121. And later in the opinion we said:

Orders Nos. 245 and 563 are set aside. Transit is directed to make restitution for all amounts collected as a consequence of the fare increase initially authorized by Order No. 245, *during the period that order was effective*, except that it may retain any portion of the excess fares necessary to preserve its earnings at the level conceded to represent a fair return.

*Id.* at 396, 415 F.2d at 976 (emphasis added).

Commission combined the periods because, in its own words, "there is nothing more clearly spelled out, repeated, and emphasized in [*Williams*] than the court's intention that the question of restitution be settled in accordance with equitable considerations." [43] This characterization of our opinion is accurate, but it does not support the Commission's holding.

When we spoke of equitable principles of restitution, it was primarily with respect to our power to mold the proper relief, not with respect to the Commission's power on remand. We pointed out that

> [o]rdinarily, of course, the proper disposition on setting aside a rate increase unlawfully ordered by the Commission would be to compel the regulated company to restore *the entire difference* between the higher fares collected under the invalid order and the amount that it would have received from the fare schedule previously in effect.[44]

In the particular circumstances *Williams* presented, we thought, however, that the usual course was too harsh, and on established equitable principles we permitted a more equitable approach than the otherwise "proper disposition." [45] Thus we had already taken the equities into account when we remanded to the Commission to compute the amount, if any, that Transit was to restore under the

guidelines we laid down, and the Commission's attempt to adjust them further was unwarranted.

■ Moreover, none of the reasons given by the Commission as to why equity demanded consolidation of the periods involved strikes us as persuasive. The Commission first said that it was "anomalous" to allow farepayers to recoup the excess income derived from Order No. 245 while, in the very same proceeding, ignoring Transit's failure to earn the conceded fair return under Order No. 564.[46] This reason exerts no equitable force since the fact that the two orders came to be considered together was fortuitous. Secondly, the Commission recalled that Transit had suffered a loss during the period for which this court stayed its Order No. 656,[47] which authorized a temporary increase in the fares permitted by Order No. 564.[48] We later approved Order No. 656 in Payne v. Washington Metropolitan Area Transit Commission,[49] and in the instant case the Commission said, in effect, that Transit should not suffer because of our stay of the interim order.[50] But the law is well settled that the risk of loss from stay of a rate order must be borne by the utility, even if the stay was wrong.[51] Thirdly, and least convincingly, the Commission argued that the excessive earnings, according to its calculations, amounted to only 1 percent of farebox revenues during the same period, and would have had only a tiny impact on

---

We made our intention equally clear with respect to Order No. 564:

> Transit will be *permitted to retain any portion of the funds transferred to it from the court-ordered reserve* which is necessary to preserve its actual earnings *during the period covered by Order No. 564* at the level conceded by the protestants to represent a fair return.

*Id.* (emphasis added; footnote omitted).

43. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 132.

44. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 364, 415 F.2d at 944 (emphasis added; footnote omitted).

45. *Id.* at 364, 415 F.2d at 944.

46. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 132.

47. D. C. Transit Sys., Inc. (Order No. 656) (WMATC Jan. 12, 1967) (unreported).

48. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 113.

49. *Supra* note 17.

50. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 133.

51. See FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 152, 83 S.Ct. 211, 9 L. Ed.2d 199 (1962) ; Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 17, 134 U.S.App.D.C. at 330–331, 415 F.2d at 910–911; Hope Natural Gas Co. v. FPC, 196 F.2d 803 (4th Cir. 1952).

the average bus rider.[52] It is enough to point out that this argument cuts as sharply against Transit as it does against the protestants.

Moreover, by combining the periods, the Commission in effect permitted Transit to recoup a shortfall in earnings, contrary to one of the basic principles of ratemaking. That principle is that a utility is not to be permitted to charge higher fares in the future in order to offset past losses.[53] True it is, as Transit and the Commission argue in this court, that this was not an ordinary recoupment case, and that none of the cases prohibiting recoupment of shortfalls is on all fours with this one. Nonetheless, the principle is equally applicable here. What we did in *Williams*, on considerations of fairness to the utility, was to treat the protestants' conceded amount of return as though it were a margin of return established by the Commission.[54] We then ordered Transit to restore, for the periods in question, the amounts it earned in excess thereof.[55] Had the protestants' figure actually been a Commission-determined return, Transit would have been unable to recover a shortfall.[56] The difference, for purposes of this case, between the two is

of no legal significance. We reverse the Commission's ruling on the issue of excess earnings.

## B. *Conceded Return*

We held in *Williams* that Transit was to restore "all amounts collected as a consequence of" the unlawful fare increase awarded by Order No. 245 "except that it may retain any portion of the excess fares necessary to preserve its earnings at the level conceded by the protestants to represent a fair return." [57] We also held that, with a similar exception, Transit was to restore to the court-ordered reserve the $1,350,000 transferred to it by Order No. 564.[58] This disposition led to a dispute before the Commission as to the amounts which the protestants had really conceded. The protestants argued that they had conceded only the dollar figures—$1,-107,000 as to Order No. 245 and $1,550,000 as to Order No. 564—which we had specified in the *Williams* opinion.[59] These figures had been computed with a view to allowing Transit "to earn gross revenues sufficient to provide a return on its equity capital of 12% after allowing for operating expenses and interest on its debt" in the

---

52. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 133–134.

53. *E. g.*, Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 17, 134 U.S.App.D.C. at 330 n. 39, 415 F.2d at 910 n. 39, and cases cited.

54. We put it in *Williams, supra* note 1, this way:

> In [allowing Transit to retain any portion of the increased fares needed to maintain its actual earnings at the level conceded by the protestants to be fair], we do not say that the Commission erred in failing to adopt the testimony of protestants' expert witness, nor that fares designed to produce the return proposed by the protestants would have been the only lawful fares, nor even that they would have been just and reasonable. We decide only that in the circumstances of this case it clearly does not offend "equity and good conscience" to permit Transit to retain that part of the fare increase essential to avoid-

ance of an undisputedly unfair return. One circumstance upon which we place considerable weight in reaching this conclusion is the availability of the Commission's 1967 decision permitting return to the equity holder quite close to that recommended by the protestants in this proceeding.

134 U.S.App.D.C. at 366, 415 F.2d at 946 (footnote omitted). The 1967 Commission decision to which we referred was D. C. Transit Sys., Inc. (Order No. 684), *supra* note 16.

55. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 364–367, 395–397, 415 F. 2d at 944–947, 975–977.

56. See text *supra* at note 53.

57. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 396, 415 F.2d at 976.

58. *Id.* at 397, 415 F.2d at 977.

59. See text *infra* at notes 63, 64.

future.[60] Thus, all the Commission had to do, the protestants claimed, was to multiply the dollar figure by the number of years the orders were in effect to determine the conceded return. The Commission, however, rejected this argument. It held that the proper course was to recalculate the conceded return by the formula protestants had used, but substituting for their test-year estimates of interest and equity the actual figures which Transit logged during each year in question.[61]

We hold that the Commission should have used the dollar figure urged upon it by the protestants.[62] Our references in *Williams* to the amounts of return conceded by the protestants were explicit. When we summarized our disposition with respect to Order No. 245, we spoke of the "level conceded by the protestants to represent a fair return," and stated that "[p]rotestants' expert recommended a return of $1,107,000. . . ." [63] With respect to Order No. 564, we made a similar reference and pointed specifically to the protestants' concession "that a fair return for Transit in 1966 would fall within the range of $1,500,000 and $1,550,000." [64] In the face of these plain statements specifying the dollar figures to be used, the Commission needed an extraordinary reason to justify recalculating the amount of the conceded return. None can be gleaned and, thus, we must find that it did not have one.

In refusing to use the dollar figures as urged by protestants, the Commission said:

[‛The Protestants' position] assumed that the proper return for each year is a single fixed figure. If the return is thus fixed, it follows that as interest expense rises, the return on equity must go down. Yet, protestants' witness never espoused such a theory. His determination of return was based on the assumption that interest expense must be covered and that a return on equity of a determined percentage over and above interest was proper.[65]

This statement overlooks the fact that when the Commission has fixed fares for Transit in the usual proceeding, it has done so with an eye to providing a certain level of return, and that this level of return has had to remain in effect until the Commission lawfully set new fares.[66] To determine what the fares should be, the Commission has employed

---

60. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 351, 415 F.2d at 931.

61. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 136.

62. Another contention proffered by petitioners in No. 23,720 is that the Commission erred in computing excess earnings because *in its computation of equity it did not deduct a figure appropriately reflecting the value of properties Transit had transferred "below the line,"* that is, had withdrawn from public service. In No. 21,-865, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, decided today, we deal with a cognate problem in relation to the Commission's Order No. 773, promulgated January 26, 1968. The reasons set forth in that opinion demonstrate merit in the argument made by petitioners in No. 23,720, but it can avail nothing here. Our decision in Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, established actual return minus conceded

return as the formula for determining the amounts of restitution due. The effect of below-the-line transfers on calculations of equity was not an element in that formula. *Williams* set the law of the cases, and we are obliged to abide it.

63. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 396 and n. 336, 415 F.2d at 976 and n. 336.

64. *Id.* at 396 and n. 334, 415 F.2d at 976 and n. 334.

65. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 136.

66. See Washington Metropolitan Area Transit Regulation Compact (Compact), tit. II, art. XII, §§ 5, 6. The Compact is incorporated into Pub.L. No. 86–794, 74 Stat. 1031 (1960), and is set forth following D.C.Code § 1–1410 (1967). Amendments to the Compact are a part of Pub.L. No. 87–767, 76 Stat. 765 (1962), and are set forth following D.C.Code § 1–1410a (1967).

data derived from a past era—the historical test period—as a basis for estimating revenues, expenses and margins of return during a future era—the future annual period.[67] The figures thus projected might vary considerably from the actual figures materializing in the "indefinite future"[68] during which the fares remained in effect, but the fares themselves could not change until the Commission issued a new fare order.[69] In the instant cases, similarly, the protestants' conceded returns were predicated on estimates of future revenues and expenses, and the concessions were amounts which, like fares possessing normal incidents, were obviously intended to stand as indefinite projections. The fact that interest expense and the level of the equity account might increase or decrease over the course of time serves little to indicate that the protestants conceded anything except the dollar figures to which we adverted in *Williams*. More importantly, the thrust of *Williams* was to treat protestants' conceded amounts of return just as though they were fair and reasonable margins of return established by the Commission,[70] and had this been done on remand, estimated rather than actual expenses would have been used to compute excess earnings.

Transit argues, however, that the Commission correctly refused to use the dollar figures protestants had conceded because in *Williams* we had said that

> we are unable to see how any proper resolution of the matter of restitution in the circumstances presented could ignore the reality of Transit's financial experience during the years in question.[71]

Our emphasis on "the reality of Transit's financial experience," Transit says,

required the Commission to recalculate the conceded return by substituting actual for estimated interest expense in the protestants' formula. Viewing this language in context, we are not so persuaded. When we spoke of financial reality, we did so in the course of rejecting any suggestion that the Commission's "estimates of expenses to be incurred and revenues to be received" should govern restitution.[72] Instead, we said, the focus should be on a comparison of Transit's "actual earnings" with "the level conceded by the protestants to represent a fair return."[73] In this context, "actual earnings" referred to the difference between operating revenues and expenses, while the conceded amounts of fair return referred to the dollar figures proposed by the protestants. And, as we have said, these dollar figures had previously been computed by the protestants, based on their own estimates of revenues and expenses. Nothing we said in *Williams*, therefore, justified the Commission's recalculation of the amounts of return conceded by the protestants to be fair and reasonable, and we reverse the Commission on this part of Order No. 981 also.

## C. *Bus Maintenance Expenses*

One of transit's arguments in support of its position that the Commission properly consolidated the two time periods involved was that this was the only way to compensate Transit for the error, which we uncovered in *Williams*, in the computation of bus maintenance expenses in Order No. 564.[74] As noted, we do not agree that the periods should have been combined, and this argument does not alter our view, but we do think that Transit should be allowed, under the equitable principles which govern these

---

67. *See, e. g.*, D. C. Transit Sys., Inc. (Order No. 245), *supra* note 2, 48 P.U.R.3d at 390.

68. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 17, 134 U.S.App.D.C. at 330, 415 F.2d at 910.

69. See note 66, *supra*, and accompanying text.

70. See text *supra* at note 54.

71. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 366, 415 F.2d at 946.

72. *Id.* at 365, 415 F.2d at 945.

73. *Id.* at 366, 415 F.2d at 946.

74. *Id.* at 385–388, 415 F.2d at 965–968.

cases, to recover for the Commission's error.

We said in *Williams:*

> Although we have also held that the Commission erred in its estimate of Transit's bus maintenance expenses for 1966, we make no separate provision to offset, by any amounts improperly disallowed, the sum which Transit is compelled to restore to the court-ordered reserve. For our disposition of the matter of restitution allows Transit a return computed on the basis of its actual experience during the period in question, and thus necessarily compensates it for all out-of-pocket expenses legitimately incurred.[75]

But unfortunately, the "disposition of the matter of restitution" we envisioned did not compensate Transit for all its "out-of-pocket expenses legitimately incurred." Our statement in *Williams* anticipated that Transit would operate at a profit, but Transit failed to earn, under any view of the figures,[76] the concededly fair rate of return under Order No. 564. Our adjudication in *Williams* that the Commission erred in estimating Transit's 1966 costs of bus maintenance thus stands unremedied.

█ In these circumstances, and without indicating what might be proper in other cases, we believe that the Commission should have charged the riders' fund with the difference between the actual amount of the maintenance expense and the amount allowed by Order No. 564 for the period that order was in effect. Indeed, the protestants tell us that they "do not quarrel with Transit's right to receive restitution as respects an inadequate allowance for bus maintenance during the 13½ month period of Order 564."[77] This disposition does not allow Transit to recoup a shortfall in earnings during the period covered by Order No. 564. It is, rather, an adjustment, to which Transit has been declared entitled, in the computation of the amount to which Transit was entitled during that period.

## III. DEFICIENCY IN DEPRECIATION RESERVE

Another component of the remand ordered in *Williams* has to do with the deficiency in a depreciation reserve.[78] The Commission had found a large deficiency, as of August 15, 1963, of $1,099,627 in Transit's reserve for depreciation on operating properties.[79] The agency's remedy was to adjust the reserve upward to the proper level and then to restore $806,168 from the previously-created court-ordered reserve toward making up this deficiency; but the Commission did not allow restoration of the remaining $293,459, of which $252,688 represented underaccruals on properties while used in transportation operations—in accounting jargon, while "above the line"—which properties had later been transferred "below the line," or to nonoperating status.[80] In *Williams* we held, so far as now pertinent, that the smaller sum ($252,688) should

75. *Id.* at 397, 415 F.2d at 977.

76. See note 40, *supra.*

77. Reply Brief for Petitioners at 4.

78. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 372–378, 415 F.2d at 952–958.

79. The deficiency was first brought to light in D. C. Transit Sys., Inc. (Order No. 381) (unreported) (WMATC Sept. 11, 1964), and when the Commission came to deal with the problem in Order No. 564, it stood at the figure mentioned in text. See Williams v. Washington Metropolitan

Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 372, 415 F.2d at 952.

80. D. C. Transit Sys., Inc. (Order No. 564), *supra* note 9, 63 P.U.R.3d at 56–57. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 3–6. The difference of $40,771 between the $293,459 and the $252,688 represented depreciation on limousines never devoted to public use, and admittedly was not recoverable from farepayers. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 377 and n. 201, 415 F.2d at 957 and n. 201.

be treated like the larger ($806,168), and that Transit's investors should have the benefit of a debiting of the court-ordered reserve only to the extent that they had not already received compensation for the underaccrued depreciation.[81] We directed the Commission, on remand of Order No. 564, to "determine the extent, if any, to which Transit's investors may have already been repaid by excesses of past actual earnings over a fair margin of return while the properties in question were in service." [82] We authorized the Commission to "permit Transit to retain any portion of the total amount of underaccruals for which its investors have not been compensated in the form of past earnings in excess of fair returns." [83] And we specified that "[a]ny amounts permitted by Order No. 564 to be withdrawn from the court-ordered reserve for which Transit's investors have already been so compensated shall be restored to the reserve." [84]

■ On remand, the protestants argued that a prime source of such reimbursement was the difference between the book value of Transit's properties and their greater fair market value when they were transferred below the line or to nonoperating subsidiaries. These are six properties, five transferred to separate subsidiaries [85] and one transferred below the line.[86] Some of them were originally used when the transit system included trolleys but which the conversion to an all-bus operation rendered superfluous; [87] the others were pieces of real estate no longer found necessary for operations. For convenience, we shall refer to all of these properties as below-the-line or nonoperating. The Commission rejected the protestants' approach on several grounds, and. they now urge this ruling as error. We hold that the Commission was wrong, and that the depreciation reserve deficiency may have been wholly wiped out through the transfer out of operation of these properties no longer used in the transportation business.

In rejecting petitioners' request to take account of the appreciation in value of these properties at the time of transfer below the line, the Commission first held that it was precluded by *Williams* from considering any such increase— from book value to market value—as reimbursement for the depreciation deficiency, and that the court had directed the agency to consider only excess earnings in that connection.[88] This was so, the Commission thought, because the *Williams* opinion, in describing the type of compensation Transit's investors may already have received for the depreciation deficiency, often used the word "earnings" and referred, expressly or implicitly, to excess earnings from operation.[89]

The significant point is, however, that that opinion also formulated the standard much more broadly as being whether "Transit's investors have . . . recouped the portion of their investment reflected by the deficiency"; [90] "whether Transit's investors have already been reimbursed for the diminished value of

81. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 372–378, 415 F.2d at 952–958.

82. *Id.* at 378, 415 F.2d at 958 (footnote omitted).

83. *Id.* at 397, 415 F.2d at 977.

84. *Id.*

85. Georgia Avenue Estates, Fourth Street Estates, M Street Estates, L Street Estates, and 3600 M Street. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, app.

86. Grace Street Shops. See *id.*

87. See *id.*

88. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 124. The Commission found no excess earnings. We are not called upon to assess the correctness of that determination. .

89. *Id.* See Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 375, 378, 397, 415 F.2d at 955, 958, 977.

90. *Id.* at 374–375, 415 F.2d at 954–955.

their investment"; [91] as "a consideration of the factors crucial to an informed decision as to where the equities really lie"; [92] whether "Transit's investors remain unreimbursed for the under-accrued depreciation" ; [93] whether Transit needed to be made "whole for any unredeemed diminution in value of its properties devoted to past public use"; [94] whether "Transit's investors have not already received adequate recompense"; [95] and whether "Transit's investors have already been reimbursed for the diminution in value of their investment in operating properties devoted to public use over and above accruals to the reserve." [96] By specifically mentioning excess earnings, perhaps the most obvious form of possible reimbursement, the court did not intend artificially to limit scrutiny of the relevant reimbursement to that source, if other forms of compensation to the investors were found to exist. The theory of the *Williams* remand on this point was that the riders' fund, being itself an equitable creation, should not be debited with the depreciation deficiency unless it was equitable to do so, and that it would not be fair and equitable if Transit's owners had already been compensated or reimbursed for that deficiency in some other form.[97] Our stress was on the overall equities, not on formal or technical requirements or limitations, or on any single method of possible reimbursement.

Nor can any contrary indication be discerned in the court's treatment in *Williams* of the part of the depreciation deficiency—$252,688—attributable to property dropped below the line after the depreciation study. The Commission feels that the court must have been aware, in that connection, of the excess of market value over book value of the

below-the-line properties, and would have said so if it had intended that appreciation to be a source of reimbursement.[98] But the excess in value to which the agency refers was not then pertinent to the point the court discussed with respect to the $252,688 deficiency; and it is stretching things much too far to assume that, in a litigation as complex and drawn-out as *Williams,* the court was omnisciently aware at all times, and on all issues, of all facts somehow brought to its attention on all of the many points, even though those particular facts were not relevant to the precise point and issue the court was considering at the moment. The court's neutral statement, stressed by both the Commission and Transit, that "[t]here is no disabling connection between a deficiency in past years' depreciation and the fact the property giving rise to it is subsequently withdrawn from public use," [99] does not negate, and was not intended to negate, the possibility that that depreciation may have been reimbursed in some other fashion than through excess earnings.

We must therefore consider whether, apart from any assumed negative directive in *Williams,* the Commission was justified in refusing to take account of the excess of market value over book value of the properties transferred out of operation. The depreciation deficiency represented, of course, the amount by which it was supposed, prima facie, that the investors had not been properly compensated in the past, through fare payments, for the diminished value—diminished through depreciation—of their investment up through 1963.[100] This assumed failure of proper compensation came about because of undercharges for depreciation. In other words, the in-

91. *Id.* at 375, 415 F.2d at 955.

92. *Id.* at 375–376, 415 F.2d at 955–956.

93. *Id.* at 376, 415 F.2d at 956.

94. *Id.* at 377, 415 F.2d at 957.

95. *Id.*

96. *Id.* at 397, 415 F.2d at 977.

97. See *id.* at 374–376, 415 F.2d at 954–956.

98. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 124–125.

99. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 378, 415 F.2d at 958.

100. See generally J. Bonbright, Principles of Public Utility Rates 194–211 (1961).

vestors were presumed to have been deprived, up to the amount of the deficiency, of the return of that allocable portion of their investment, and were therefore entitled to have that remainder returned in another form. But it also follows, as a corollary, that any compensation to the owners which is properly allocable to offsetting these prior undercharges—to recoupment of the theretofore unrecouped part of the investment —would plainly fall within our mandate that the investors were only entitled to recover the deficiency to the extent that they had not already been reimbursed.[101]

■ In the sense of our directive, can Transit's owners be said to have been so reimbursed through the considerable appreciation in value of the depreciable properties transferred out of operations? Those properties were transferred at their book value, which was quite low. As hereinafter appears,[102] figures which are not challenged by the Commission at all, and not adequately disputed by Transit, indicate that, at the time of transfer, the fair market value of the depreciable part of the transferred properties, omitting entirely the nondepreciable or land portion, may well have been sufficiently high that the difference between the two figures—the gain in value of those depreciable assets —may have more than offset the entire depreciation deficiency—the theretofore unrecovered cost of the assets represented in the deficiency which should have been recovered prior to August, 1963. On principle, this gain can be appropriately considered as returning the other-

wise unrecovered cost to the owners. Just as with the excess profits mentioned in *Williams*,[103] gain in the value of depreciable property is an acceptable vehicle through which investors can receive back their investment.

■ In No. 21,865, Democratic Central Committee v. Washington Metropolitan Area Transit Commission, decided today, we consider the competing claims of Transit's investors and consumers to appreciations in value of its assets, depreciable and nondepreciable, while in operating status.[104] After carefully analyzing the problem in light of fundamental ratemaking principles and applicable precedents,[105] we conclude that Transit's investors do not automatically succeed to capital gains achieved on operating properties prior to transfer below the line,[106] but that, in Transit's circumstances, its farepayers have the superior right.[107] With respect to depreciable utility assets, we point out that ratepayers bear the risk of loss,[108] and thus are equitably entitled to the gains.[109] We also point out that Transit's customers have shouldered the financial burden of the conversion from a streetcar-bus to an all-bus system[110]—which in turn has relegated most of the questioned properties to nonoperating status —and that, by the same token, they have justly earned the benefits flowing from that conversion.[111] It is clear from our elaborate discussion of the problem in *Democratic Central Committee* that Transit's riders stand on solid ground in insisting upon an offset of the depreciation deficiency by a corresponding

---

101. See *id.*: Note, Accounting for Extraordinary Obsolescence, 65 Harv.L.Rev. 1431, 1432 (1952). *See also* Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 125, 188 F.2d 11, 21 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

102. See note 137, *infra.*

103. See text *supra* at notes 83–97.

104. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, pts. II–IV.

105. *Id.* at pt. II.

106. *Id.* at pt. III.

107. *Id.* at pt. IV.

108. *Id.* at pt. IV(A).

109. *Id.* at pt. IV(B).

110. *Id.* at pt. IV(B).

111. *Id.* at pt. IV(B).

amount of the capital gains from transferred depreciable assets which Transit's investors have kept for themselves.

In an official pronouncement, the Commission has already indicated that a gain of that type, incurred while the properties were in public service, can properly be considered as fairly belonging to the farepayers, not the investors. Commission Regulation 61, promulgated in 1966 and not in terms applicable to this case, provides that when depreciable property is transferred below the line, the company must file a fair market valuation of the property, and the excess of fair market value, determined by appraisal, over the unrecovered cost must be deducted from the appreciation expense in the transfer years so that the ratepayers will receive the benefit of the increase in value.[112] The underlying principle and genesis of this regulation was explained by the Commission in Order No. 1090.[113] That order said that "[t]he Commission promulgated Regulation 61 on the basis of the history of Transit's dealings with below-the-line properties. During the few years preceding its issuance, a number of proper-

ties had become unnecessary to the company's current operations. The company had put these properties to work in activities not related to mass transit operations." [114] These were, of course, the properties we are now discussing, or some of them. Order No. 1090 then refused to apply the approach of Regulation 61 to transfers occurring before it was issued,[115] but in doing so expressly acknowledged "the ratepayer's entitlement to reimbursement for depreciation expense which ultimately turns out to be unnecessary," [116] though the Commission thought that, where Regulation 61 did not apply, this would occur only upon sale or disposition of the properties.[117] The same order also said that "[t]here is no question that, when depreciable operating property is sold and a gain is realized, the gain should be used to reduce the depreciation expense which ratepayers have paid but which the company, because of the gain, does not actually incur." [118] On the basis of what the Commission said in its Order No. 1090, as well as what it said earlier in Order No. 981 now under review, we judge that there is no question that, if the

---

112. Regulation 61 in relevant part provides: 61–04. *Accounting Treatment.* If the Commission approves the removal or divestiture, the following accounting treatment shall be prescribed: (a) the operating property accounts shall be adjusted to reflect the appraised values for land and for buildings as accepted by the Commission; (b) the adjustment to the Land Account shall be contra-charged or contra-credited, as applicable, to the carrier's Surplus or Retained Earnings Account; (c) the adjustment to the Buildings and/or other depreciable property account shall be contra-charged or contra-credited, as applicable, to the Depreciation Expense-Adjustments Account; provided, however, that if the appraised value of depreciable property is such that the required adjustment exceeds the cumulative depreciation theretofore charged to operations for such property, the amount of the adjustment contra-credited to the Depreciation Expense-Adjustments Account shall be limited to the amount of such cumulative depreciation for such property and the excess shall be credited di-

rectly to the Retained Earnings Account; (d) after these adjustments to the relevant operating property accounts, these property accounts are to be transferred, at the new fair values, out of the operating property accounts of the carrier. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 67–68.

113. D. C. Transit Sys., Inc. (Order No. 1090), 85 P.U.R.3d 508, 513 (1970), denying application of John M. Cleary for reconsideration of D. C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R.3d 1 (1970). On petitions by other litigants, Order No. 1052 is reviewed in No. 24,398, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62.

114. D. C. Transit Sys., Inc. (Order No. 1090), *supra* note 113, 85 P.U.R.3d at 513.

115. *Id.* at 514.

116. *Id.*

117. *Id.*

118. *Id.* at 513.

transferred properties had been sold and not merely held below the line, the Commission would itself consider that the gain could appropriately be used for the benefit of the riders.

The issue thus narrows to the "time of that reimbursement," to use the Commission's wording in Order No. 1090 [119]—whether, for the purposes of the *Williams* remand, gain on depreciable property at the time of transfer out of operation to below the line shall be treated as compensation or reimbursement for the deficiency in past depreciation, or whether, on the other hand, no account should be taken of that gain until disposition of the property. We reject and put to one side, at the outset of our discussion of this dispositive issue, certain formal arguments offered to support the Commission's choice of the latter alternative. It is not an improper collateral attack on Order No. 381,[120] which established the depreciation deficiency, to consider that reimbursement came through the increase in value of the transferred assets. Order No. 381 stands without challenge by anyone as to the existence of the deficiency on Transit's books or the accounting treatment prescribed for dealing with that deficiency. The remand ordered in *Williams* to see whether and to what extent that book deficiency had been offset by reimbursement to investors was obviously not a collateral attack on the order; it follows that it cannot be a collateral attack to pinpoint one source of such reimbursement. Second, the issue is not whether Regulation 61, mentioned above, should be applied retroactively. There is no attempt to invoke the accounting features of that regulation or to fit its terms to this case. The true question of

substance is not the technical retroactivity of Regulation 61 but whether its main underlying principle should be used here in deciding the special equitable problem of whether Transit's investors have been compensated for the depreciation deficiency through the increase in value of the below-the-line real estate. That is the issue we now face.

Only two significant nonformal grounds are advanced for nonapplication here of the general principle that gain on transfer of depreciable operating properties belongs to and should be used for the consumer. The first is that no such gain exists until it is realized through sale or disposition. The second is that, in any event, it is unfair to Transit's investors to apply this principle to them at this time when they had reason to believe at the time of the transfers that the gain would be theirs and not the farepayers.

There are, of course, differences between "an appreciation in value which remains potential and unrealized," as the Commission put it in Order No. 1090,[121] and one which has been fully realized, but those distinctions are not important for the particular inquiry in which we are now engaged. That precise search, we stress, is whether in economic fact and in equity Transit's owners have already been compensated for the depreciation deficiency so that the riders' fund should not be debited by that deficiency. In Regulation 61, the Commission has demonstrated that it does not consider the difference between realization and potentiality important for comparable purposes.[122] Transit did not challenge Regulation 61 when it was issued and it does not, in this case, give

---

119. *Id.* at 514.

120. D. C. Transit Sys., Inc. (Order No. 381), *supra* note 79.

121. D. C. Transit Sys., Inc. (Order No. 1090), *supra* note 113, 85 P.U.R.3d at 513.

122. *Id.* at 513–14. See also D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 119–20. Equation of a transfer below the line and an actual sale does not mean however, that the fair market value of the transferred assets should not be adjusted to reflect taxes and expenses payable had the property been sold rather than transferred. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 74 n. 343.

us any reason, aside from the alleged unfairness of now applying the principle after the transfers, for thinking the difference significant. The properties had been, for all practical purposes, removed from the transportation business and now exist for the benefit of the investors. There is no suggestion that the market value of these depreciable assets has decreased since the times of transfer, nor that there was any real possibility that it would go below that figure.[123] The Commission assured us in Order No. 1090 that if the properties were ever actually disposed of by Transit, the Commission could consider and take whatever action might be justified to protect the farepayers' acknowledged interest.[124] The Commission also pointed to some use of these properties in recent years to further the interests of the company's mass transit operations—for example, through the use of mortgage money—and feared that if the benefit of the appreciation in value went to the riding public before actual disposition Transit would probably seek to sell them, to the disadvantage of the company's overall stability.[125]

Those same arguments could be made against Regulation 61 but the Commission nevertheless adopted it in 1966. In any event, these were all future possibilities, not probabilities, which cannot, in our view, outweigh the hard and present fact that the riders' fund will be debited in the present proceeding with some million dollars because of the depreciation deficiency unless the investors are found to have been already compensated for that deficiency. The wisdom we apply is that of the bird in hand. The high probability was that, in economic fact, the investors had been compensated by the increase in value and that that increase had in economic fact gone to them, not the riders. The possibility that they might be deprived of that gain in the future, in whole or in part, seems no higher than the countervailing possibility that the depreciation deficiency might ultimately turn out, on retirement or disposition of Transit's assets, to be overstated.

The other major objection to petitioners' contention is that it is unfair to the investors to saddle them now with a detriment they could not foresee when the properties were placed below the line. We can assume that Transit thought that when it took those actions the increase in value of these depreciable properties would all go to its investors. But this belief, if it existed, was unfounded; the court had already announced that, with respect to depreciable property—and that is all we are considering in this point—the profit upon transfer out of operation can be used to defray unrecovered depreciation expense.[126] Moreover, it is no more unfair to use this gain, even though the owners expected to return it all, than to use the excess profits specifically referred to in *Williams*,[127] as to the use of which the owners were no more alerted at the time.

We can also assume that Transit considered that, at any rate, it would not have to share these profits in this way until disposition of the property, and that nothing in the governing system of accounts or the regulations warned it otherwise. Nevertheless, it is not unfair to make an order contrary to that assumption. As we have already indicated in discussing realization versus potentiality,[128] the factual circumstances

123. See note 137, *infra*.

124. D. C. Transit Sys., Inc. (Order No. 1090), *supra* note 113, 85 P.U.R.3d at 514.

125. *Id.*

126. See Washington Gas Light Co. v. Baker, *supra* note 101, 88 U.S.App.D.C. at 124–126, 188 F.2d at 20–22. See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 121 U.S.App.D.C. at 397, 350 F.2d at 775; Bebchick v. Public Utils. Comm'n, *supra* note 13, 115 U.S.App.D.C. at 224–225, 318 F.2d at 195–196.

127. See text *supra* at notes 82–83.

128. See text *supra* following note 121.

are such that no proper interest of the investors will be substantially harmed by treating them, for the limited purposes of the *Williams* mandate, as if they had actually realized the gain on the transferred depreciable properties. The minimal possibility that the market value of the properties will decrease below their value at transfer time is not enough to insist that the public must wait until actual disposition.

In this connection, it is important to emphasize, as we now do, that in so holding we are not invading the Commission's administrative province. All the matters we have been discussing concern both the disposition of the riders' fund, a court-created reserve,[129] and the *Williams* mandate. In administering the court-ordered reserve, the Commission "acts more nearly as a trustee to implement judicial directives concerning the use of the fund than in the exercise of its statutory regulatory powers."[130] We have greater authority with respect to the use of that fund than we might have in reviewing a Commission action taken strictly within its statutory regulatory function. Similarly, in seeing whether our specific directives in *Williams* have been complied with, we are required to give less deference to the

Commission's views and can more readily rest upon our own judgment of what the mandate calls for. Especially in considering "where the equities really lie"[131] are we freed from bowing to the administrator's view of the equities.[132]

It is evident that the busriding public may be harmed by any further postponement of the offset. A public takeover of Transit's bus system has occurred.[133] There has been no indication to us that the properties in question were sold before the takeover. The indication, rather, is that Transit, as a continuing corporate entity,[134] will retain ownership, directly or through its wholly-owned subsidiaries, of its nonoperating properties.[135] Just when Transit might thereafter decide to dispose of them can only be a guess on anyone else's part. If the busriders are ever to benefit from the depreciation deficiency, they must be permitted to do so now.

We hold, therefore, that the Commission erred in refusing to consider whether Transit's investors were compensated for the depreciation deficiency by "the 'gain' represented by the excess of market value over unrecovered cost of properties transferred to below-the-line status."[136] Accordingly, we remand this inquiry to the Commission.[137]

129. See Bebchick v. Public Utils. Comm'n. *supra* note 13, 115 U.S.App.D.C. at 232–233, 381 F.2d at 203–204.

130. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 377 n. 199, 415 F.2d at 957 n. 199.

131. *Id.* at 376, 415 F.2d at 956.

132. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 71–74.

133. National Capital Area Transit Act of 1972, Pub.L. No. 92–517, 86 Stat. 999 (1972). See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 83–88.

134. National Capital Area Transit Act of 1972, § 102(d), 86 Stat. 1001 (1972).

135. The National Capital Area Transit Act of 1972, 86 Stat. 1001 (1972), authorized the Washington Metropolitan Area Transit Authority to "acquire the capital stock

or *transit facilities* of" privately-owned transit companies operating in the Washington metropolitan area. § 101(a), and expressed "the sense of the Congress that the . . . Transit Authority . . . should initiate negotiations . . . with" Transit and a wholly-owned transit subsidiary "for acquisition by the Transit Authority of capital stock or facilities, plant, equipment, real and personal property of such bus companies . . . *used or useful for mass transportation by bus of passengers* within the Washington metropolitan area," § 102(a) (emphasis supplied).

136. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 128.

137. Petitioners in No. 23,720 have presented figures, which are hardly contested, tending to show that the fair market value of the depreciable portions of the transferred properties was $1,568,152, while all parties agree that the depreciation de-

If Transit is not willing to concede that the net gain on the transferred properties exceeded the depreciation deficiency,[138] then the Commission will have to determine the fair market value of the properties at the time of the transfer [139] and compute the net gain to Transit, taking into account taxes and costs which might have reduced the gain if the properties had been sold.[140] In either event, the Commission will then have to make appropriate adjustments to the court-ordered reserve.

## IV. ATTORNEYS' AND EXPERTS' FEES AND LITIGATION EXPENSES

In Order No. 981, the Commission ruled that it had no authority to determine fees for protestants' counsel and expert witnesses.[141] Petitioners attack this holding, pointing out that after *Williams*, when they asked this court to retain jurisdiction in order to enter fee awards, both Commission counsel and Transit assured the court that the Commission could and should undertake this function. We denied the motion, and although the Commission has changed its position in court, we remain of the same view. The Commission had the power to dispose of the court-ordered refund in accordance with our directives.[142] In *Bebchick v. Public Utilities Commission*,[143] we indicated that fees and appropriate litigation expenses could be charged to the court-ordered reserve.[144] And in *Williams* we characterized the Commission's function in administering the court-ordered reserve, we repeat, as more nearly "a trustee to implement judicial directives concerning the use of the fund than in the exercise of its statutory regulatory powers." [145] There is nothing in the Compact [146] which precluded the agency from determining such fees and expenses, under our mandate, as part of the determination of proper fares and of Transit's expenses and accounts. On the contrary, the Compact declares that "[t]he Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders . . . as it may find necessary or appropriate to carry out

ficiency stands at $1,058,856. Acceptance of these figures would, of course, avoid a remand on the point, but we deem it preferable to have the Commission make the necessary computations. Petitioners' calculation of fair market value of the properties is based on the assumption that their assessed values—for purposes of taxation—are 65% of fair market value. There is support for this in the record, but there has been no such finding by the Commission, or concession by Transit. Moreover, petitioners' figures do not take into consideration taxes and expenses which would have been incurred by Transit if the properties had actually been sold. To fail to deduct such items is to misstate the gain to Transit from the below-the-line transfer of these properties. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 74 n. 343. Additionally, the Commission will have to ascertain net gains on all of Transit's below-the-line realty, depreciable and nondepreciable, *id.* at 85, and the case at bar must for other reasons be remanded anyway. We leave appropriate adjustments, if any, to the Commission if the parties are unable to agree.

138. See note 137, *supra.*

139. This may, of course, be done conjunctively with the determinations required by our remand in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 85. See note 137, *supra.*

140. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 74 n. 343.

141. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 143.

142. See Bebchick v. Public Utils. Comm'n, *supra* note 13, 115 U.S.App.D.C. at 232–233, 318 F.2d at 203–204; Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 396 n. 377, 415 F.2d at 976 n. 377.

143. *Supra* note 13.

144. 115 U.S.App.D.C. at 233, 318 F.2d at 204.

145. 134 U.S.App.D.C. at 377 n. 199, 415 F. 2d at 957 n. 199.

146. *Supra* note 66.

the provisions of this Act." [147] We hold that between the Compact and our holdings in Bebchick-Williams, there was sufficient authority for the agency to undertake this function, subject to review by this court. And since Transit will have to make restitution to the court-ordered reserve, an award in this case is appropriate.[148] It goes without saying that we intimate no view at this time as to the proper award to be made for fees and expenses. That is wholly left, in the first instance, for the Commission to determine.[149]

## V. TRANSIT'S CHALLENGES

In No. 23,747, Transit seeks to overturn certain aspects of Order No. 981 which the Commission decided adversely to the company. We reject the challenges and affirm the Commission on these portions of its order.

### A. Acquisition Adjustment Account

In Williams, the court held, with respect to the acquisition adjustment account, that the Commission should redetermine the schedule for amortization of the balance in that account on January 1, 1964, the Commission's new changeover date, relate that schedule to the remaining lives of the properties in service on that date, and deposit in the court-ordered reserve any amounts theretofore charged against the account in excess of amounts then found to be

proper.[150] On remand, the Commission found this deficiency to be $884,986, and credited it to the court-ordered reserve.[151] Transit raises three issues as to this determination.

The first is that the deficiency in the amount of the amortization of the acquisition adjustment account should have first been used to compute Transit's actual earnings—should first have been "run through income"—to see whether earnings were actually excessive during the relevant periods, and not credited directly to the court reserve as the Commission ordered. The point made is that, unless this is done, the company is required to make restitution of an amount which did not in fact constitute excess earnings. However, the company's suggestion is contrary to the explicit mandate of Williams, as the Commission noted.[152] Williams required the agency to do exactly what it did. In addition, the argument neglects the prospective character of ratemaking [153] and would substitute restitution to Transit for restitution by Transit.[154] The earnings to be looked to are not the actual historical earnings, but those the company was expected to have made, during the pertinent period, at the time the applicable fares were set. On that basis, looking forward, there would be "excess" earnings because of the failure properly to amortize the acquisition adjustment

147. Compact, supra note 66, tit. II, art. XII, § 15.

148. Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1881); Walsh v. National Sav. & Trust Co., 101 U.S.App. D.C. 195, 247 F.2d 781 (1957); Washington Gas Light Co. v. Baker, 90 U.S. App.D.C. 98, 102–104, 195 F.2d 29, 32–35 (1951). See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–390, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Annot., 9 A.L.R.2d 1132 (1950).

149. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, supra note 62, at 85.

150. Williams v. Washington Metropolitan Area Transit Comm'n, supra note 1, 134

U.S.App.D.C. at 367–372, 397, 415 F.2d at 947–952, 977.

151. D. C. Transit Sys., Inc. (Order No. 981), supra note 32, 81 P.U.R.3d at 121.

152. Id.

153. See Williams v. Washington Metropolitan Area Transit Comm'n, supra note 1, 134 U.S.App.D.C. at 360–361, 415 F.2d at 940–941. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, supra note 62, at 76–77, and text supra at notes 65–70.

154. See text supra at notes 46–56. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, supra note 62, at 78–79.

account. For the purposes with which we are now concerned, it makes no difference whether or not, as things turned out, that amount of earnings was actually made.[155]

Transit's second point on the treatment of the acquisition adjustment account is that the Commission should have deducted from the balance of the account the amount of depreciation attributable to properties placed below the line between 1956 and January 1, 1964. The company's theory is that the account was established to offset excessive depreciation charges, and since the farepayers were not charged for depreciation on the below-the-line properties, those assets should also be excised from the countervailing acquisition adjustment account.

One sufficient answer is that Transit did not lay any proper factual foundation for implementation of this claim. The original amount lumped together all property acquired in 1956, depreciable and nondepreciable,[156] for the purpose of accommodating the $10 million difference between the book value of the property and the price Transit paid when it acquired the assets of Capital Transit Company, its predecessor.[157] On the *Williams* remand, Transit did not prove either the proper allocation of the acquisition adjustment account among the various properties acquired in 1956 or the correlation between the amount of acquisition adjustment amortized with respect to each such piece of property and the amount of depreciation accrued on that property while it was above the line. Such proof would be a necessary precondition to sustaining Transit's argument, but since it was not properly made here, the record does not support the claim.

█ We believe, moreover, the Commission properly rejected Transit's theory on the merits. As it said:

[W]e do not accept Transit's view of the essential nature of the acquisition adjustment account. While it did involve adjustment of depreciation expense, its essential purpose was to pass along to the riding public the bargain enjoyed by Transit as a result of the fact that the purchase price it paid was some $10 million under the book value of the property it acquired. That bargain price was not all attributable to depreciable property. To accept Transit's theory would mean that a portion of the benefit which that bargain involved would be lost to the riding public. Moreover, it would be lost as a result of a transaction which involves other substantial benefits for the investors which result from transferring property below the line. We refuse to countenance such a result.[158]

Transit's only response is that "the establishment of the Acquisition Adjustment Account was related solely to depreciable properties."[159] But this simply is not so, as the Commission held.[160] As we ourselves have said, "[t]he Acquisition Adjustment Account reflects a savings realized when Transit purchased Capital Transit's properties,"[161] and this saving was to be passed on to the farepayers "in the form of reduced de-

155. See Part II(A), *supra*.

156. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 119, quoted in text *infra* at note 158; D. C. Transit Sys., Inc. (Order No. 3592), at 5 and exs. 2 and 3 (D.C.Pub.Utils.Comm'n Nov. 27, 1957) (unreported).

157. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 119, quoted in text *infra* at note 158. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 55–56, and cases there cited.

158. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 119.

159. Reply Brief for Petitioner in No. 23,747 at 18.

160. D. C. Transit Sys., Inc. (Order No. 981), *supra* note 32, 81 P.U.R.3d at 119, quoted in text *supra* at note 158. See also note 156, *supra*.

161. D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 121 U.S.App.D.C. at 390, 350 F. 2d at 768.

preciation in the total amount" of the saving.[162] Transit would have us abandon this principle, and we decline to do so.

The last matter on the Acquisition Adjustment Account is Transit's charge that the Commission erred in holding that the period over which the balance of the account should be liquidated ended with the expiration date of the company's franchise. As we have indicated immediately above, the genesis of the account was the $10 million windfall to Transit when it acquired Capital Transit's assets in 1956.[163] It was entirely reasonable for the Commission to decide that the present owners should pass that windfall on to the farepayers by the end of their franchise.[164] In *Williams*, we did not demand an exact relationship between this account and depreciation accruals, but only a "reasonable relationship."[165] The relatively small amount of depreciation—$335,775— which even Transit estimated would still remain at franchise-end on properties then remaining in service, meaning that less than 3 percent of the 1956 properties would continue to accrue depreciation, shows that such a "reasonable relationship" would be maintained under the Commission's directive that the Acquisition Adjustment Account be amortized by the expiration date of the franchise.

B. *Restitution to Transit*

Three of Transit's attacks upon Order No. 981 are effectively mooted by our decision on the protestants' appeal in No. 23,720 that the Commission should have calculated the company's return— for the purpose of determining the addition to the court-ordered reserve as a result of the holding in *Williams* that the fares set by Orders Nos. 245 and 564 were invalid—at the dollar figure conceded by the protestants.[166] First, that holding disposes of, and moots, Transit's argument that the Commission erred in concluding that, in computing the level of return over operating expenses conceded by the protestants during the period of those orders, the amount of the company's return on equity was limited to the amount obtained by utilizing the percentage return on equity employed by the protestants' witnesses in the 1963 and 1965 fare proceedings.

The other contentions are that the Commission erred in refusing, under *Williams*, to give Transit restitution for various shortfalls in earnings. Our reasoning in No. 23,720 [167] squarely applies. *Williams* did not provide for retroactive ratemaking or for combining the periods of Orders Nos. 245 and 564. Nor did *Williams* require or allow for restitution to Transit. On the contrary, the whole aim of the *Williams* remand was to provide for restitution to the farepayers because the orders were overturned.[168] Transit did not succeed in invalidating the orders insofar as it sought to do so, and was not entitled to restitution because it failed to earn as much as was expected.[169] The court-ordered reserve was for the riders' benefit, not the company's.

162. Bebchick v. Public Utils. Comm'n, *supra* note 13, 115 U.S.App.D.C. at 221, 318 F.2d at 192. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 56; D. C. Transit Sys., Inc. (Order No. 245), *supra* note 21, 48 P.U.R.3d at 394; D. C. Transit Sys., Inc. (Order No. 3592), *supra* note 156, at 4, 6.

163. See text *supra* at note 158. See also Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 134 U.S.App.D.C. at 367, 415 F.2d at 947; and cases cited in notes 161 and 162, *supra*.

164. See cases cited *supra* notes 161, 162.

165. 134 U.S.App.D.C. at 372, 415 F.2d at 952.

166. See Part II(B), *supra*.

167. Part II(A), *supra*.

168. 134 U.S.App.D.C. at 358–367, 396–397, 415 F.2d at 938–947, 976–977. See also Democratic Cent. Comm'n v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 78–79.

169. See text *supra* at notes 53–56.

## C. *Investment Tax Credit*

 Finally, Transit complains that the Commission should not have required that any investment tax credits realized in the future be passed on to the riders. But that result was precisely envisaged by *Williams,* which left the determination of what was to be due to those credits to the discretion of the Commission.[170] On the record made, that discretion was clearly not abused. In effect, we held in *Williams* that, on the facts now found, the Commission could make the order it has now made.[171]

## VI. DISPOSITION

Our conclusions on the issues presented on this review necessitate a further remand to the Commission for proceedings in harmony with this opinion.

 The Commission will cancel the adjustment of the riders' fund predicated upon the combination of the operative periods of Orders Nos. 245, 563 and 564, and the use of actual interest and equity figures; and must then, in lieu of that adjustment, add to that fund $1,461,756 representing Transit's earnings, in excess of the protestants' conceded fair return, under Orders Nos. 245 and 563.[172] The Commission will also reexamine the allowance of the deficiency of $252,688 in Transit's depreciation reserve and the corresponding debit to the riders' fund; and must then determine whether Transit's investors were compensated for that deficiency by an excess of market value of depreciable properties transferred from above to below the line and make adjustments to the fund accordingly.[173] The Commission will, too, permit Transit to recoup from the fund the difference between the amount of bus maintenance expense estimated in the formulation of Order No. 564 and the expense actually incurred during the period that order was in force.[174] And lastly, the Commission will set, subject to this court's approval, the amounts to be paid from the fund as fees to the protestants' counsel and expert witnesses.[175]

With the recent public takeover of Transit's operating franchise,[176] there will remain the question of a suitable disposition of the balance remaining in the fund after the foregoing adjustments have been completed. We think we might profit from the Commission's views. We accordingly invite the Commission to frame recommendations after, of course, affording interested parties an opportunity to be heard.[177] Our jurisdiction of the case is retained in full.

So ordered.

---

170. 134 U.S.App.D.C. at 378–383, 397, 415 F.2d at 958–963, 977.

171. *Id.* at 382–383, 397, 415 F.2d at 962–963, 977.

172. See Part II(A), (B), *supra.*

173. See Part III, *supra.*

174. See Part II(C), *supra.*

175. See Part IV, *supra.*

176. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 62, at 85–88. Shortly prior to the takeover, petitioners in No. 23,720 filed a motion requesting that we consider, in fashioning our disposition of this litigation, the changes in circumstances which would be occasioned thereby. Transit filed an answer and a motion to strike petitioners' motion on the ground that it introduced facts outside the record and nonexistent when the impugned orders were promulgated by the Commission. We reject these contentions. The takeover and its terms are matters of public record and common knowledge, well within the range of judicial notice. It is obvious that the changes wrought by the takeover must be reckoned with in the restitutional process which has long since become necessary. We deal now with the consequences of the takeover as far as we are able at this juncture to determine its bearing on the relief appropriately to be awarded. See *id.* at 85–86. Any further implementation of the suggestions proffered by petitioners' motion must await the Commission's response to the present remand. See *id.* Accordingly, petitioners' motion is granted in part and denied in part, and Transit's motion to strike is denied.

177. See *id.* at 88.

MacKINNON, Circuit Judge (concurring):

I concur in this decision, but retain some doubts as to the propriety of the recognition of gain at the time of transfer of properties below the line—discussed in Part III. I accept that disposition only with reference to the facts of this case and if presented with such a transaction in a different context and for different purposes would have serious doubts about such an approach.